[Civ. No. 25672. Second Dist., Div. Two. May 2, 1962.]

ATLAS TERMINALS, INC., Plaintiff and Appellant, v. ARTHUR SOKOL et al., Defendants and Respondents; ALICE REJTO et al., Interveners and Respondents.

Leslie & Bernson, Jacques Leslie and Harold B. Bernson for Plaintiff and Appellant.

Morris Abraham, Greenwald, Holland, Landrum & Baim and Lee W. Landrum for Defendants and Respondents.

Harry P. Warner and Zerner & Sims for Interveners and Respondents.

ASHBURN, J.—Plaintiff Atlas Terminals, Inc., brought this action for declaratory relief and quiet title, having as its objective an adjudication that restrictions imposed upon lots in tract No. 5542, commonly known as Carthay Circle Tract, in the City of Los Angeles, are not binding upon lots 63 to 69, inclusive, which are owned by plaintiff and front on the north side of Warner Drive in said tract. Plaintiff also owns lots 14 to 18 fronting on Wilshire Boulevard and plans to erect a 27-story office building thereon with a two-story garage, 400 feet long, situated on lots 63-68, which adjoin 14 to 18 on the south. The Wilshire frontage was adjudged in 1938 to be no longer bound by the restrictions confining use to first-class family residences; the properties adjoining that tier of lots on the south, i.e., lots on the north side of Warner Drive, have never been so relieved except lot 63 and 40 feet of lot 64 which were also cleared by a court decree. In its major aspects the judgment went against plaintiff though it declares unenforceable certain minor restrictions.[1] Plaintiff appeals.

The tract, consisting of 134 acres and comprising more than 490 lots, is situated at the southwest corner of the intersection of Wilshire Boulevard and Fairfax Avenue, extending thence to the Beverly Hills city limit on the west and to Olympic Boulevard on the south. Warner Drive parallels Wilshire and is one block south of it. McCarthy Vista runs approximately north and south and is the next street west of Fairfax. However, there is a passageway (apparently for pedestrians only) which runs north and south approximately half way between Fairfax and McCarthy Vista; it bears the name San Diego Way. Lots 63-69 lie between McCarthy Vista and San Diego Way and front south on Warner Drive.

The rapid growth of Wilshire and Fairfax as major traffic arteries and business frontage has substantially impaired the desirability of lots bordering on the street for first class residential purposes. The trial judge, after months of taking evidence and a careful inspection of the properties involved in the action, concluded that the Warner Drive frontage in

---

[1]These relate to:

1. Building less than 4 feet from the side line of a lot;
2. Selling to or occupation by any person not belonging to the white race;
3. Requiring submission of all building plans to a building committee;
4. Holding all planting to a distance of 5 feet from the front of the house.

The court held 2 to be void and the others to have been waived by nonobservance.

question had been so impaired by the encroachments of business on Wilshire that it is no longer desirable for first-class residential use and is suitable and desirable only for business and commercial uses as an adjunct to Wilshire Boulevard property, but that enforcement of said restrictions upon plaintiff's lots (except 63 and part of 64) will continue to benefit and effectuate the purposes of same as originally imposed with respect to other lots in the tract such as those owned by interveners who ''fairly represent all owners of single family residential property'' in the tract; that the lots on the north side of Warner Drive must be preserved as a buffer between business and residence use, though enforcement of the restrictions upon those particular lots will not be of any value or benefit to them. Viewing the matter in the large the court decided that, for the preservation of the residential nature of the tract as a whole, the line between business and residences must be drawn at the rear boundary of the lots on the north side of Warner Drive. In other words, that the erosion of business upon the perimeters of the tract should not be permitted in equity to advance unchecked from one tier of lots to another until the major purposes of the subdivision are defeated, for the tract as a whole after many years (1922 to 1961) ''is developed and well maintained as a single family residence district'' and ''the continued maintenance of such restrictions is of material and continuing benefit to the remaining properties in said tract.'' For reasons hereinafter set forth we have concluded that this ruling is correct.

Major restrictions around which this case revolves are these: ''That said lot or lots facing or fronting upon Warner Drive east of McCarthy Vista and on Del Valle Drive shall be used for residence purposes only; That no apartment house, flat, lodging house, hotel or any building or structure whatever other than one first-class single private residence of one-story only on Del Valle Drive, and of two-stories only on Warner Drive, with the customary outbuildings, including a private garage, shall be erected, placed or permitted on said lots.'' The restrictions were imposed pursuant to a general and uniform plan of improvement and are molded in the form of conditions and covenants inuring to the benefit of all lot owners in the tract and constitute equitable servitudes upon each lot for the benefit of all others, binding upon and inuring to the benefit of the successors in interest of each lot owner.

Plaintiff's contention is that the neighborhood has so changed that the lots in question are no longer suited to

single private residence use and it is inequitable to enforce that restriction against them and their owner, the plaintiff. There is, as will be shown, no hard and fast rule that clearing boulevard frontage of restrictions connotes a further right to do that with respect to a second tier of lots and then a third and so on until a whole tract is freed merely because the frontage on a given street is no longer suitable for continuance of the use prescribed by the restrictions.

The guiding principle here applicable is thus stated in *Fairchild* v. *Raines*, 24 Cal.2d 818, 828 [151 P.2d 260]: "Even if restrictions are not enforcible as to every lot in an area originally covered by an agreement they may be upheld as to a part of that area if such part is of sufficient extent and so located that the original purpose of the restrictions can be accomplished."

Volume 7, Hastings Law Journal, page 210: "California and other states have taken the view that restrictive covenants will be enforced if they are of 'substantial value' to remaining lot owners and if no 'radical' changes have occurred." Volume 2, Witkin, Summary of California Law (7th ed.) section 221, page 1052: "But the change must be such that the original purpose of the restriction can no longer be realized." Volume 16, California Law Review, page 60: "The change must be such as practically to defeat the purpose of the restriction."

Mr. Justice Spence's dissent in *Wolff* v. *Fallon*, 44 Cal.2d 695, 699 [283 P.2d 802], says this: "[O]ne of the main cases upon which the majority relies clearly indicates that the changed conditions in the neighborhood must have 'rendered the purpose of the restrictions obsolete.' (*Marra* v. *Aetna Const. Co.*, 15 Cal.2d 375, 378 [101 P.2d 490].) This court further said: 'But, if the original purpose of the covenant can still be realized, it will be enforced even though the unrestricted use of the property would be more profitable to its owner.' (Pp. 378-379.) ...

"There is no finding by the trial court that any alleged changes in the neighborhood have rendered the purposes of the restrictions 'obsolete' or that the original purpose of such restrictions cannot be realized; and if any of the trial court's findings may be said to be to that effect, I find no evidence to support such findings.

"It seems clear that a line must be drawn somewhere dividing residential and commercial development in any tract

where both are to be permitted. It seems equally clear that the residential lots which are contiguous to commercial lots will necessarily be somewhat less valuable. This situation is inherent in any plan of restrictive covenants to provide for orderly development; and it cannot justify the lifting of the restrictions on such contiguous lots unless the plan itself is to be destroyed.'' Mr. Justice Traynor concurred in this dissent.

The question of the effect upon a second tier of lots of breaking restrictions upon a first tier of business frontage seems not to have received specific discussion in the California decisions. But they enunciate principles which fully sustain the trial judge's views. *Robertson* v. *Nichols*, 92 Cal. App.2d 201 [206 P.2d 898], is pertinent. The plaintiff there sought unsuccessfully to break residential restrictions because that had been done with respect to Wilshire Boulevard frontage. The factual situation is stated at page 207: ''The tract as originally subdivided contained 117 lots. One hundred of the lots are improved with single-family residences, all of them 25 or more years old, except one built in 1939. At the northeast corner of Wilshire and Bronson (the southwest corner of the tract) there is located a seven-story apartment house; immediately to the east of the apartment building is a public market, and then a parking lot. Behind the apartment building, three lots on Bronson contain a tennis court and a garage. The five lots of plaintiffs are immediately to the north of the garage, front to the west on Bronson, and extend to Sixth Street, having a total frontage of approximately 240 feet.'' At page 208 the court said: ''It is true that the restrictions have been broken along Wilshire Boulevard, but as stated in *Fairchild* v. *Raines*, 24 Cal.2d 818, 828 [151 P.2d 260], 'The fact that all the lots in the tract are not subject to the covenant is not conclusive of the issue. Even if restrictions are not enforcible as to every lot in an area originally covered by an agreement they may be upheld as to a part of that area if such part is of sufficient extent and so located that the original purpose of the restrictions can be accomplished.' (See also *Downs* v. *Kroeger*, 200 Cal. 743, 749 [254 P. 1101].) With respect to the Wilshire frontage, the situation created by the growth of the city and the development of the boulevard could be said to have rendered enforcement of the restrictions impracticable and inequitable. But as to the remainder of the tract, the purpose of the restrictions has been achieved and can continue to be main-

tained. While the presence of the business frontage on Wilshire Boulevard may or may not have, to some extent, diminished the desirability of the lots in the tract for residence purposes, it has not rendered them unsuitable therefor. True, the lots of plaintiffs are not perhaps so desirable as those to the north and east which have been built upon, but the trial court's finding that plaintiffs' property is suitable and desirable for residence purposes is supported by substantial evidence. The fact that unrestricted use of the property would be more profitable does not warrant failure to enforce the restriction if the original purpose of the covenant can still be realized.'' At page 209: ''The nature of the tract is settled as a residential area with a fringe of commercial property along Wilshire Boulevard. The question is whether the residential area shall be protected against further encroachment. The line must be drawn somewhere, and the trial court has drawn it by placing plaintiffs' properties within the restricted area. Conditions at some late date may warrant lifting the restrictions, but under the circumstances and evidence considered by the trial judge, it cannot be held that his findings as of the time of trial are without substantial evidentiary support, and the discretion exercised by him ought not, except in case of clear abuse, be disturbed upon appeal.''

The persuasive pertinence of this decision at bar will become readily apparent when the facts are fully appreciated.

Defendant Bank of America National Trust and Savings Association is successor in interest, by consolidation and otherwise, to Hellman Commercial Trust and Savings Bank which caused recordation of the subdivision map on October 24, 1922. As previously stated, the tract is bounded on the north by Wilshire Boulevard, on the east by Fairfax Avenue, on the west by a line 150 feet west of Schumacher Drive (the Beverly Hills city limit) and south by Olympic Boulevard. It comprises 134 acres and is divided into more than 490 lots. Warner Drive parallels Wilshire and is one block south of it. All lots on Warner Drive between McCarthy Vista and San Diego Way were improved, at the time of suit, with two-story single-family residences except lot 63 and the west 40 feet of lot 64, which have never been improved.

Defendants and respondents Sokol, Deutsch, et al., are owners of lots fronting on the south side of Warner Drive. There are two sets of interveners-respondents. Rejto, Zeesman, et al., own lots 97, 88, 139 and 140; the first two mentioned front on the south side of Warner Drive and the

other two on the north side of Del Valle Drive which is the next street south of Warner Drive and parallel with it. Interveners-respondents Jackson, et al., own lots 126, 128, 129, 130, 132, 138, 162, all of which front on Del Valle Drive between McCarthy Vista and Fairfax Avenue. The court found that defendants and interveners "represent categories of property closest to plaintiff's within the tract" and do "fairly represent all owners of single family residential property" therein. Properties on Warner Drive between McCarthy Vista and Fairfax are the only lots improved by two-story single-family residences. Property on Del Valle Drive and that west of McCarthy Vista is typical of one-story single-family residential development within the entire tract.

The court found: "That since the execution of said deeds originally imposing said restrictions, owing to the general growth of the city of Los Angeles, Wilshire Boulevard has been widened and improved with the highest type of paving, extending from the central business district of the City of Los Angeles to the Pacific Ocean, and traffic control signals of the latest type have been installed thereon from said central business district to, in front of, and beyond said Tract 5542, and lanes and markings have been designated thereon for the handling of heavy high-speed traffic according to the most modern traffic engineering methods. That said Wilshire Boulevard is a part of the major traffic system of the City of Los Angeles. . . . That Fairfax Avenue has since said time been improved as a major traffic artery. . . . That said Wilshire Boulevard and Fairfax Avenue abutting upon and along said Tract 5542, and for a considerable distance in each direction from and beyond said Tract 5542, have since said times definitely changed in character and have been improved generally with business structures, and prior to the commencement of this action had become, and ever since have been, definitely and essentially business streets, and the property fronting and abutting thereon has, prior to the commencement of this action, become and ever since has been definitely and essentially business property; that contemporaneously with this action, Fairfax Avenue between Wilshire Boulevard and Del Valle Drive, which is Eighth Street east of Fairfax Avenue, is being improved for a department store and automobile parking purposes." It was also found that the following changes have taken place in the vicinity of the subject property: May's department store and parking facilities have been erected at the northeast corner of Wilshire and Fairfax;

Fairfax at Wilshire has become a junction for exchange of bus line passengers and a terminus of one bus route. The southeast corner of the same intersection "is being developed" by the erection of the Seibu Department Store and a garage for 1,000 automobiles; the entire frontage on Wilshire between San Vicente and Fairfax has become commercial and is devoted to stores and office buildings with large electrical signs; Wilshire Boulevard has been zoned for business or commercial purposes. The northwest corner of McCarthy Vista Drive and Warner Drive had been devoted to surface parking of automobiles (on lots 19 and 62); at the northwest corner of Fairfax and Warner, lots 81 and 82 have been devoted to the same use; the northerly lot line of lots 63-82 (McCarthy Vista to Fairfax) is 165 feet from the southerly line of Wilshire and "this tier of lots now immediately abut the commercial development of Wilshire Boulevard, with no buffer zone"; lots on the north and south sides of Warner Drive are "subject in some degree to the noise and fumes of traffic on McCarthy Vista Drive and Fairfax Avenue, which is intense on Lots 18, 106, 105, 1, 82 and 83, and which decreases toward the center of the block along Warner Drive, of which McCarthy Vista Drive and Fairfax Avenue are the termini;" that the restrictions have been held in eight specified court cases to be unenforceable as to various lots, most of which are Wilshire frontage or are situated west of McCarthy Vista,—the exceptions being 81, 82, 83 and 84, at the intersection of Warner and Fairfax; 81 and 82 are used as a parking lot for the Thrifty Drug store which is at the northwest corner of Wilshire and Fairfax; lots 105 and 106 at the southeast corner of Warner and McCarthy Vista are used for surface parking; lot 63 and the west 40 feet of lot 64 at the northeast corner of Warner and McCarthy Vista are available but not used for surface parking and owned by plaintiff.

The court further found: "That upon the subdivision of said Tract 5542 in 1922 the 490 lots therein were almost immediately developed and improved by the construction of residences in keeping with the residential restrictions imposed thereon, except on the Wilshire Boulevard frontage. That with few exceptions, at the date of commencement of this action the physical structure of said homes was generally subject to ordinary obsolescence and deterioration from age; that in addition many homes within the tract became outmoded and would not now be designated in their price

range as first-class single family residences. However, in the 2-story homes along Warner Drive and in some on Del Valle Drive, some residents have made substantial improvements to modernize said residences; so that in general the same now are, with some exceptions, hereinafter noted, generally convenient, suitable and desirable for first class single family residence purposes according to prevailing standards; and that the defendants' properties now range in fair market value from $35,000.00 to $50,000.00." "[A]ll of the occupied lots on Warner Drive were originally improved with substantial 2-story single family dwellings; that at the time of its development said Warner Drive was a first class residential street; that the first dwelling thereon was constructed in 1923, and that the last dwelling thereon was constructed in 1939, and that in the area mentioned Lot 63 and the west 40 feet of Lot 64, and Lot 83, were never improved; that since the date of construction this block has been maintained generally in a clean, attractive and safe condition as a part of a residential neighborhood; that except for plaintiff's properties, Lots 63 to 68 inclusive, and Lots 81, 82 and 83, said street is still exclusively residential in character; except that Gabor Rejto and wife, owners of Lot 97, commonly known as 6230 Warner Drive, have used and still use said premises for the conduct of music lessons." "[T]hat the enforcement of the said restrictions, except as to Lots 63 and 64 owned by the said plaintiff, would be of material benefit at this time to the lots owned by the defendants and intervenors, and in varying degrees to each and every lot in the said tract lying east of McCarthy Vista Drive and lying north of Olympic Boulevard, south of Wilshire Boulevard and west of Fairfax Avenue; save and except that the same would be of no benefit to the properties abutting Wilshire Boulevard, Fairfax Avenue and Olympic Boulevard." "That plaintiff, defendants and intervenors are entitled to a decree declaring in favor of it, its successors and assigns, that Lots 63 to 69, in relation to all other lots in said Tract 5542, and their owners, are held free and clear of those restrictions specified in Paragraphs IX, X, XI and XII; and partially relieved of such residential restriction as to Lots 63 and 64 as specified in Paragraph VIII and Paragraph XIII of the Findings; and that in all other respects, such conditions and restrictions imposed are at this time valid and binding, and that no right of reverter exists as to any of the properties of the plaintiff for any breach of conditions or covenants in said deeds of convey-

ance." "That Cross-complainants are entitled to an injunction restraining plaintiff from any use or occupation of said Lots 65 to 69 inclusive, in violation of any of the applicable covenants and restrictions respecting the use of their said properties, as herein determined to be valid and subsisting."

Plaintiff purchased lots 63-69 on the north side of Warner Drive, with full knowledge of the deed restrictions "believing that by change of circumstances, since said covenant conditions were originally imposed, that the same were no longer enforceable, and . . . the plaintiff at all times has proceeded to act in relation to its said properties upon such assumption."

 Appellant does not claim insufficiency of the evidence in any respect, but relies primarily upon the argument that the probative findings conflict irreconcilably with the ultimate finding. Defendants Sokol, et al., seek to interject an issue of insufficiency of the evidence into the case, but they as respondents cannot enlarge the scope of appellant's appeal and substitute claims of error for those urged by its counsel. In their reply brief counsel for appellant say: "The sole question on appeal is not whether there is substantial evidence to support the findings and judgment. The question is whether the conclusions and judgment are inconsistent with and unsupported by the numerous probative findings. Appellant contends that the probative findings are fully supported by substantial and uncontradicted evidence. Consequently the ultimate finding by the lower court that it is just and equitable to enforce the deed restrictions is a bare and unsupported finding entirely inconsistent with, and directly contradictory to, the probative findings."

Pursuing this thesis appellant's counsel seize upon the following findings: VI. ". . . That it is true that plaintiff's Lots 66, 67 and 68 in said Tract as acquired by plaintiff were suitable for residential uses, but it is true that said Lots 63, 64, 65, 66, 67 and 68 at all times immediately prior to and since their acquisition by the plaintiff have not been and are not desirable for first-class single family residential use, and have not been first-class single family residential property, in either an improved or unimproved state, but are suitable and desirable only for business or commercial uses as an adjunct to said Wilshire property."[2] Without explanation

---

[2] "In view of the circumstances herein found to be true, the enforcement of the conditions and restrictions pertaining to exclusive use of the plaintiff's properties northerly of Warner Drive for first class . single

this is a puzzling finding when read in the light of the ultimate one "that the continued enforcement of such deed residential restrictions in all other respects not specifically covered herein upon lots 63 to 68 inclusive would not be unjust and inequitable, in that enforcement of such restrictions will continue to benefit and to effectuate the purposes of same as originally imposed for the benefit of properties in Tract 5542, particularly on Warner Drive, where and to the extent that the owners thereof have not waived the same, either expressly or by default herein, or where such rights of individual lot owners have not hitherto been abrogated by judicial decree." But an elucidation of the challenged finding is found in the court's oral summation: "The record establishes that Tract 5542, and in particular Warner Drive, with which we are primarily concerned, is not itself at present in a transitional stage to commercial uses. Except for the Wilshire frontage, there is no evidence that there has been any substantial invasion of the tract by commercial interests except on its perimeter. It has continued to be used for single family residential purposes for 30 years more or less following the relinquishment or removal of conditions on the Wilshire Boulevard frontage, and for long periods of time following the removal of restrictions involving other commercial uses in the southerly portion. . . . It is urged that this neighborhood is in a transitional stage because not far away there are these commercial enterprises, the operation of which would be prevented in an exclusively first-class residential district. I think, as was indicated in one of the cases I referred to, that that would be a fallacious basis of changing the restrictions. To establish that principle as one of law

family residences will not restore Tract 5542 to such uses and purposes as originally contemplated."

"[P]laintiff's lots 63 to 69 inclusive are not well situated for single family residences, but that upon the contrary finds that they are neither suitable nor desirable for first-class single family residential purposes."

"[T]hat it is not true that the entire Tract 5542, with the exceptions stated, is modern, nor that its single family residences are predominately first class, but finds in fact that the same are generally depreciated due to their age of from 20 to 30 years, and that they are, by architecture and construction, generally so designed, constructed and equipped in a manner which is now obsolete, or obsolescent, under present day standards applicable to first class single family residences of like floor space; and that the residences in proximity to Wilshire Boulevard, Fairfax Avenue, San Vicente Boulevard and Olympic Boulevard, and by the use and development of said thoroughfares have lost isolation, seclusion and insulation from noises, gasses, lights, views and crowds of people, generally appertaining to commercial districts and pursuits, and heavily travelled traffic arteries."

would negative the existence of lines of demarcation dividing commercial, residential and first-class districts.

"To paraphrase the language of the case I have referred to, the fact that there are sources of discomfort outside the tract, particularly upon its northern, southern and eastern boundaries, should not permit the plaintiff to violate the boundary and to add to the discomfort from within.

"It would be error to overemphasize the proximity of the business enterprises and to fail to recognize that no substantial inroads have been made within the area in question. If changed conditions outside of a restricted area become such as to make certain property in a restricted area less valuable for the purpose and the use for which it was sold, no good reason exists for the violation of those restrictions if to do so other property owners in the restricted district would be forced to suffer great damages to their property. Certainly the property immediately adjacent to that upon which the restrictions were violated would suffer first, and perhaps most. In such circumstances the adjacent owner could, with like propriety violate the restrictions; then the next one to him in equity would have an equal right, and so on throughout the entire tract.

"By such a process of reasoning, the entire purpose and intention originally expressed to create a restricted first-class residential district could be thwarted, and all property owners who did not wish to accept the changed situation and convert their homes into business property would be penalized without fault on their part."

Again: "Now we come to grips with the main question. The rule in relation to whether or not restrictive covenants shall be enforced or declared cancelled, as I have studied it and as these cases I have read to you declare it, is a two-fold rule. In order for conditions to be no longer applicable to the plaintiff's property, it must be shown that the plaintiff's property is no longer of a character, because of the changes, that it can be used for the purpose intended in the creation of the tract, and that it would be inequitable to enforce the restriction upon the plaintiff's property.

"That last clause, however, is defined in terms of the other element more eloquently in these out-of-state cases, I believe, than in our own. The real question is whether the continued enforcement of the restrictions would be of substantial benefit to the remaining properties in the tract.

"In this case there is no doubt in my mind that the plaintiff has established by a preponderance of the evidence the first element. None of the plaintiff's properties on the north side of Warner Drive, in fact, none of the properties on the north side of Warner Drive, between McCarthy Vista and Fairfax are longer suitable and desirable as first-class single family residential property. They are the buffer. Their back yards directly abut the commercial facilities on Wilshire Boulevard. With the erection of any commercial building 24 stories, or even of four stories, all privacy is gone. They are subjected now to a barrage of noise and light. The fact that the residences on that side of the street continue to be used for residential purposes is simply the element of circumstance that they have been developed and they have been occupied, and to a certain extent the owners have employed defensive measures to minimize these factors which, ab initio, would preclude their having this character of first-class single family residential property.

"When we pass, however, to the south side of Warner Drive, there is considerable though proportional insulation from these external influences. There has been the rehabilitation of which counsel have spoken in many instances, and the Court has observed the condition of those houses. There can be no question but what they are doomed as single family residences, suitable and desirable for the purposes, if on the north side there is a further intrusion of commercial uses, and particularly if there were a garage building constructed on the corner between 300 and 400 feet in length and 20 or more feet in height.

"It is at this point, I think, the Court must declare that while the plaintiff abundantly has established the first half of the equation, that it has failed to establish the second. The continued enforcement of the restrictions will protect for some considerable period of time, the exact length of which is unpredictable, the single family residential characteristics of those residences, and those which lie behind them in the tract. ...

"The fact that the plaintiff purchased these properties with full knowledge of restrictions, although in a bona fide belief that they were not enforceable, precludes the application of any overriding equity in favor of a plaintiff who has property which is not residential but is limited to it as against the owners whose properties still may be protected."

These thoughts are reflected in Finding XIV: "The Court

finds that although there has been a substantial change in conditions since the tract was subdivided and the restrictions imposed, the said Tract 5542 generally is developed and well maintained as a single family residence district, and that although the continued enforcement of the covenants and restrictions against other than single family dwelling use and occupation is no longer of any use or benefit to the owners of Lots 63 to 82 inclusive, that the continued maintenance of such restrictions is of material and continuing benefit to the remaining properties in the said tract; and that with the exceptions hereinbefore found that it is both just and equitable that the said restrictions be maintained and enforced. . . .

"That the construction of a two-story parking garage as proposed by plaintiff would inequitably damage and depreciate the property values of defendants and cross-complainants, and impair in varying degrees the enjoyment of those properties on the south side of Warner Drive between McCarthy Vista Drive and Fairfax Avenue; and that they have no plain, speedy and adequate remedy at law; and that it is equitable and proper that said plaintiff be restrained from so doing, subject to the further order of the Court and its continuing jurisdiction in this cause."

There are over 400 lots within the tract which do not abut upon perimeter lots and which are protected by this enforcement of the restrictions as to the Warner Drive frontage.

Not only does the philosophy of *Robertson* v. *Nichols, supra,* 92 Cal.App.2d 201, and other authorities above quoted, sustain the position taken by the trial court, but cases decided in other States, which meet our problem head-on, give further and highly persuasive support to the trial judge.

*Rombauer* v. *Compton Heights Christian Church,* 328 Mo. 1 [40 S.W.2d 545] reaches our specific problem. At page 553 [40 S.W.2d], the court says: "No hard and fast rule can be laid down as to when changed conditions have defeated the purpose of restrictions, but it can be safely asserted the changes must be so radical as practically to destroy the essential objects and purposes of the agreement. Thus an urban tract may be dedicated to residential use under certain restrictions indicating an intention to establish a secluded district for high-class homes. It is inevitable that with the lapse of time the march of progress and the shifting and growth of the city the forces of disintegration will be at work, the houses architecturally and otherwise will become more and more out of date, other residential districts still more pretentious may be

laid out, and changes may crowd about, outside. But the parties must be deemed to have anticipated these things and to have intended to combat them as far as possible. And so, if later the necessity of invoking the restrictive covenants arises, the mere fact that, because of changed conditions, the restrictions are less valuable than they once were, will not prevent their enforcement if the district still retains its essential character and the restrictions remain of substantial value. . . . Neither is it true that because a small part of a restricted district, lying along the edge or at the threshold thereof, is forced to bear the brunt of attack from outside commercial expansion, and as a result is impaired in value for the use prescribed by the restrictions—in these circumstances we say, it is not true that the restrictions will be abated as to the part so affected because of the hardship visited upon that particular land as compared with the sheltered portions of the district. [Citations.] The very purpose of the restrictions is to protect the property in the covenanted area from such invasions [citations]; and if the restrictions are of substantial value to the covenantees, equity may enforce them though serious injury result to the servient estate [citations]."

*Bortz* v. *Troth*, 350 Pa. 326 [59 A.2d 93, 97] : "What appellee in effect suggests, and what the court en banc has done, is to declare a neighborhood to be in a transitional stage because not far away there are commercial enterprises, the operation of which would be prevented in an exclusively residential district. To establish that principle as one of law will negative the existence of lines of demarcation dividing commercial, residential and exclusively residential districts. Commercial areas would be moved forward without restraint, except that equitable relief might be afforded if the given business were shown to constitute a nuisance in fact. Fringe areas would advance so that block after block would steadily succumb to inroads of industrial enterprises. . . . The error of the majority of the court en banc was over-emphasis upon the proximity of existing business enterprises and failure to recognize the fact that no inroads had been within the area in question which has remained exclusively residential. Boundaries there must be, which divide commercial from residential and residential from exclusively residential. Exclusively residential districts are not to be denied the benefit of principles of law and equity appertaining thereto because bordered by or proximate to districts termed commercial."

*Kokenge* v. *Whetstone*, 60 Ohio App. 302 [20 N.E.2d 965,

966] : "Now the only relaxation of the restrictive covenants relates to lots abutting on Erie avenue in the square immediately west of the eastern boundary of the subdivision to the east, of which in the next square is the business district, outside the Mooney subdivision. The restrictive covenant has been and is being observed in all other parts of the subdivision. The affected square is only a small part of the subdivision.

"It is claimed that because the defendants consented to, acquiesced in, and did not resist the use of some of the lots in that square for non-residential purposes, they cannot now insist upon the observance of the restriction in the use of any of the lots in that square.

"The conclusion would be justified only in the event the use of those few lots for non-residential purposes so affected the property within the entire subdivision as to render the enforcement of the covenant of no substantial value to any property owner in the subdivision for the purpose for which the covenant was imposed, that is, to preserve the property exclusively for residential purposes, with the attendant comforts and conveniences. The record presents no such case.

"On the contrary, the record shows that with the exception of these few lots on the border of the subdivision all the other lots have been improved by the building of substantial dwellings thereon with one exception, and that is occupied by a church edifice. The residences and the yards are all kept in good condition, so that they constitute a very desirable and attractive suburban residence community. The use of these few lots on the margin for business purposes has not to any great extent detracted from the desirability of any of the subdivision for residence purposes except a few adjoining lots. . . .

"The very purpose of this restrictive covenant was to cast a burden upon each lot for the benefit of all the other lots. In equity it created easements upon each lot in favor of every other lot. The fact that the servient estate could be used more extensively if it were free of the burden, or would have a greater value, is no basis for removing the burden. It is the absence of substantial value to the dominant estate that creates the equity in favor of quieting the title, and so long as substantial value remains, no equity arises in favor of the servient owners."

Note in 4 American Law Reports 2d, pages 1111, 1115: "The apparent weight of authority supports the proposition that

the fact that a small portion of a restricted district, lying along the edge or at the threshold thereof, is forced to bear the brunt of attack from changed conditions outside the district, with resultant impairment in value for the use prescribed by the restrictions, does not justify abatement of the restrictions as to the part so affected because of the hardship visited upon that particular land as compared with the sheltered portion of the district.''

Now we reach appellant's claim of irreconcilable inconsistency in the findings. Counsel stress, among others, the finding above quoted to the effect that appellant's lots 63-69 are not now desirable for first-class single-family residential use and are suitable and desirable only for business and commercial uses as an adjunct to appellant's Wilshire property. Of course, findings are to be construed together and, if possible, so harmonized as to support the judgment. (48 Cal. Jur.2d, § 314, pp. 317-318; *Banner Metals, Inc.* v. *Lockwood,* 178 Cal.App.2d 643, 655 [3 Cal.Rptr. 421].) But we need no rules of construction to apply here. The findings under consideration blend into an harmonious whole and reflect a carefully considered and well-balanced judicial conclusion that the residential restrictions are enforceable with respect to the lots in question. For the same reasons there is no merit in appellant's second point, that the probative findings do not support the conclusionary findings.

 Lastly, it is argued that the court erred in awarding money judgments to cross-complainant-respondents as damages for violation of the following restriction: ''That he or they will keep said premises in a clean and sightly condition by removing therefrom dead grass, weeds, rubbish, or any other thing which may render said lot unsightly, or in any undesirable condition.'' There are nine such awards ranging from $10 to $200 in amount. That this remedy will lie for breach of a restrictive covenant is established by such cases as *Joyce* v. *Krupp,* 83 Cal.App. 391, 397-398 [257 P. 124]; *Barrows* v. *Jackson,* 112 Cal.App.2d 534, 548 [247 P.2d 99].

 Appellant's assertion that there was no evidence to support the awards is too broad and general to raise the question. ''Appellant submits that there has been no evidence whatsoever of any condition existing on Appellant's property other than an alleged condition of unsightliness. . . . [T]hat there is no evidence whatever of any dust being carried over to the properties owned by the said respondents. Nor, was

there any evidence whatever of any specific damage to said property owned by the said respondents. Further, appellant submits that the evidence of the physical invasion of dust originating on plaintiff's property and carried to the property of the respondents fails to sustain proof that that dust arose from anything but a normal condition on vacant property. There is no evidence whatever, of any substantial damage.''

■ The applicable rules are stated in *Davis* v. *Lucas,* 180 Cal.App.2d 407, 409 [4 Cal.Rptr. 479] : ''The appellate court starts with the presumption that the evidence sustains each finding of fact [citations], and the burden rests upon appellant 'to demonstrate that there is no substantial evidence to support the challenged findings.' [Citations.] ■ To this end appellant must set forth in his brief all material evidence upon the point, not merely his own proofs [citations] ; if this is not done the point is deemed waived (so held in the cases just cited). Counsel in this case has made no real effort to comply with the rule. ■ '[A] claim of insufficiency of the evidence to justify findings, consisting of mere assertion without a fair statement of the evidence, is entitled to no consideration, when it is apparent, as it is here, that a substantial amount of evidence was received on behalf of the respondents.' (*Estate of Good,* 146 Cal.App.2d 704, 706 [304 P.2d 190].) . . . We do not make an independent search of the record to uncover error. Our duty with respect to this contention of appellant is now discharged.''

■ Moreover, the court viewed the premises involved in the action and this is evidence in itself. (*McCarthy* v. *City of Manhattan Beach,* 41 Cal.2d 879, 889 [264 P.2d 932] ; *Key* v. *McCabe,* 54 Cal.2d 736, 739 [8 Cal.Rptr. 425, 356 P.2d 169].) Also, the transcript contains many pages of testimony upon this subject. There is no merit in this assignment of error.

■ The last point raised in appellant's opening brief is denial of due process of law. After asserting this, counsel devote no more attention to it, thus waiving the point. ( 4 Cal. Jur.2d, § 484, p. 318.) In the reply brief counsel seek in a mild way to revive the claim, but there is nothing in it. Even if the judgment were erroneous, that would not constitute a denial of due process of law. As said in *Worcester County Trust Co.* v. *Riley,* 302 U.S. 292, 299 [58 S.Ct. 185, 82 L.Ed. 268] : ''In any case the Constitution of the United States does not guarantee that the decisions of state courts shall be free from error, *Central Land Co.* v. *Laidley,* 159 U.S. 103 [40 L.Ed. 91, 16 S.Ct. 80] ; *Tracy* v. *Ginzberg,* 205 U.S. 170

[51 L.Ed. 755, 27 S.Ct. 461], or require that pronouncements shall be consistent. *Milwaukee Electric R. & Light Co.* v. *Wisconsin,* 252 U.S. 100, 106 [64 L.Ed. 476, 480, 40 S.Ct. 306, 10 A.L.R. 892.''

*Datta* v. *Staab,* 173 Cal.App.2d 613, 621 [343 P.2d 977] : ''Due process does not guarantee either a correct decision or consistency in decision.''

The judgment is affirmed.

Fox, P. J., and Herndon, J., concurred.

A petition for a rehearing was denied May 29, 1962, and appellant's petition for a hearing by the Supreme Court was denied June 27, 1962.