[Civ. No. 51565. Second Dist., Div. Three. Mar. 9, 1978.]

JACK A. SAIN et al., Plaintiffs and Respondents, v.
SEVERIN SILVESTRE et al., Defendants and Appellants.

462

**COUNSEL**

Cooper, Epstein & Hurewitz and Alan D. Gross for Defendants and Appellants.

Friedman & Cone, Henry Friedman and Donald L. A. Kerson for Plaintiffs and Respondents.

## OPINION

FAINER, J.*—Defendants, the Silvestres, appeal from a judgment ordering them to remove certain structures on their residential property (herein sometimes called lot 18) within 30 days after entry of judgment or pay to plaintiffs, the Sains, the sum of $15,000. The judgment also awarded plaintiffs $4,200 in attorneys' fees and court costs in the sum of $243. The judgment was entered on August 6, 1976; defendants filed a motion for a new trial on November 22, 1976, alleging both newly discovered evidence which could not have been discovered and produced at trial and excessive damages. The motion for new trial was denied.[1]

Defendants make numerous contentions on appeal, including the following:

1. The tract developer did not satisfy the requirements necessary to impose mutual equitable servitudes on the residential properties owned by plaintiffs and defendants.

2. The foreclosure, by private sale, of the deed of trust on the tract in which the residential properties are located, securing a $300,000 indebtedness borrowed by the tract developer, eliminated the mutual equitable servitudes if they were, in fact, enforceable at the time.

In addition to those contentions, both parties contend that if they are successful on this appeal they should be awarded attorneys' fees and costs as the prevailing party.

THE EQUITABLE SERVITUDES SATISFY
THE REQUIREMENTS OF THE CALIFORNIA
LAW GOVERNING THEIR CREATION

 In the landmark case of *Werner* v. *Graham* (1919) 181 Cal. 174 [183 P. 945], the California Supreme Court gave approval to the concept of mutual equitable servitudes as a method of imposing reasonable land use controls and private restrictions on the property of a grantee provided that certain requirements are met. Equitable servitudes have

---

*Assigned by the Chairperson of the Judicial Council.

[1]Defendants appear to be appealing the order denying their motion for a new trial following judgment. Such an order is not an appealable order and the purported appeal is dismissed. (*Powers* v. *Sissoev* (1974) 39 Cal.App.3d 865, 870 [114 Cal.Rptr. 868].)

been used frequently in the subdivision of large tracts of land in modern urban areas to promote sound community development by establishing uniform restrictions on the use and occupancy of all lots to be sold in the subdivision.[2]

"... According to *Werner,* a general plan of real estate development can give rise to mutual equitable servitudes only when both the grantor and grantee intend that the land conveyed is to be restricted pursuant to a general plan, that intent appears in the deed, the parties' agreement shows that the parcel conveyed is subject to restrictions in accordance with the plan for the benefit of all the other parcels in the subdivision and such other parcels are subject to like restrictions for its benefit, and the dominant and servient tenements are adequately shown. [Citations.] 'In such a case the mutual servitudes spring into existence as between the first parcel conveyed and the balance of the parcels *at the time of the first conveyance.* As each conveyance follows, the burden and the benefit of the mutual restrictions imposed by preceding conveyances as between the particular parcel conveyed and those previously conveyed pass as an incident of the ownership of the parcel, and similar restrictions are created by the conveyance as between the lot conveyed and the lots still retained by the original owner.' " *(Terry* v. *James* (1977) 72 Cal.App.3d 438, 442-443 [140 Cal.Rptr. 201]; italics in original.)

Ordinarily, a general plan of restriction is recorded by the subdivider grantor for the purpose of insuring the uniform and orderly development and use of the entire tract by all of the original purchasers as well as their successors in interest. The restrictions are imposed upon each parcel within the tract. These subdivision restrictions are used to limit the type of buildings that can be constructed upon the property or the type of activity permitted on the property, prohibiting such things as commercial use or development within the tract,[3] limiting the height of buildings, imposing setback restrictions, protecting views,[4] or imposing similar restrictions.[5]

---

[2]See 2 Bowman, Ogden's Revised California Real Property Law (Cont.Ed.Bar 1975) section 23.19, page 1150.

[3]See *Hurd* v. *Albert* (1931) 214 Cal. 15 [3 P.2d 545]; *Atlas Terminals, Inc.* v. *Sokol* (1962) 203 Cal.App.2d 191 [21 Cal.Rptr. 293].

[4]See *Trahms* v. *Starrett* (1973) 34 Cal.App.3d 766 [110 Cal.Rptr. 239]; *Seligman* v. *Tucker* (1970) 6 Cal.App.3d 691 [86 Cal.Rptr. 187].

[5]See *Mock* v. *Shulman* (1964) 226 Cal.App.2d 263 [38 Cal.Rptr. 39], in which there was a height limitation on hedges.

In 1963 the entire tract in which the residential properties in question are located was owned by land developers Anderson and Kelly, who are hereinafter referred to as either Anderson or the common grantor. On October 14, 1964, Anderson recorded a "Declaration of Restrictions (Tract 27436)" to "establish a general plan for the improvement and development" of the tract. The declaration included the following language as paragraph IV: "No hedge or hedgerow, or wall or fence or other structure shall be planted, erected, located or maintained upon any lot in such location or in such height as to unreasonably obstruct the view toward Coldwater Canyon from any other lot or lots on said tract." The "Declaration of Restrictions" as recorded by Anderson expressed the intent to impose a general plan of restrictions on the tract and expressly declared that the restrictions were for the benefit of the lots in the tract. (*Martin* v. *Ray* (1946) 76 Cal.App.2d 471, 474 [173 P.2d 573].) There was a designation or description of the dominant tenement in the declaration sufficient to satisfy the requirements of case law. (*Wing* v. *Forest Lawn Cemetery Assn.* (1940) 15 Cal.2d 472, 480 [101 P.2d 1099, 130 A.L.R. 120].)

 The practice of recording a declaration is favored by tract owners because it reduces the filing fee for each deed and assures that the restrictions in the deeds will be uniform. (See, 2 Bowman, Ogden's Revised Cal. Real Property Law, *supra,* § 23.22, p. 1153.) While the recorded declaration of restrictions should be incorporated by reference in each deed, this is not a fatal omission provided that the recorded restrictions are incorporated by reference in the first deed and provided that the subsequent grantees of the remaining lots in the tract take title to their lots with notice, actual or constructive, of the recorded declaration of restrictions. ". . . The requirement of notice is satisfied by the reference in each of the deeds to the restrictions, the common plan, and the description of the benefited property. [Fn. omitted.] If the equitable servitudes were created properly, a legal description of the property subject to the restrictions will appear in the 'chain of title' in the County Recorder's Office for the county in which the property is located. [Fn. citations omitted.] *Such recording constitutes constructive notice of the restrictions sufficient to satisfy the notice requirement.* [Fn. citations: *Gamble* v. *Fierman* (1927) 82 Cal.App. 180 . . . ; *Wayt* v. *Patee* (1928) 205 Cal. 46 . . . .]" (4 Miller & Starr, Current Law of Cal. Real Estate (rev. ed. 1977) § 25:8, p. 177; italics added.)[6]

---

[6]See also *Riley* v. *Bear Creek Planning Committee* (1976) 17 Cal.3d 500, at page 507 [131 Cal.Rptr. 381, 551 P.2d 1213], in which the court states the following: "From the

Under the general tract plan of restrictions, the mutual servitudes "spring into existence" at the time of the first conveyance by the tract owner. The grantee in the first deed acquires the right to enforce the restrictions against the grantor's remaining lots and the purchasers to whom the grantor later conveys the remaining lots. The subsequent grantees with notice take titles to their lots subject to the restrictions. (*Riley* v. *Bear Creek Planning Committee, supra,* 17 Cal.3d 500, 505-506; *Werner* v. *Graham, supra,* 181 Cal. 174, 183-184.)

On November 12, 1965, Anderson, the common grantor, conveyed lot 17 of the tract to plaintiffs' predecessors in interest. This conveyance was by a grant deed recorded December 14, 1965, and stated that it was subject to "Conditions, restrictions, reservations, covenants, easements, rights and rights of way of record, if any." At the time of this conveyance, which was the first conveyance in the tract, mutual building and land use restrictions sprang into existence so that plaintiffs' predecessors in interest, the grantees in the first deed, acquired the right to enforce the restrictions against the grantor's remaining lots and the purchasers to whom the grantor later conveyed those lots. In 1967 the original grantees of lot 17 conveyed their interest in the lot to plaintiffs herein.[7]

The common grantor also conveyed two other lots, numbers 9 and 10, in 1966. Those conveyances were by grant deed and were expressly made subject to the conditions, covenants and restrictions of record.

In August 1963, Anderson borrowed $300,000 from San Fernando Valley Federal Savings and Loan Association (herein Valley Federal), which debt was secured by a deed of trust on the entire tract, recorded August 27, 1963. The recording of this deed of trust was prior in time to the recording of the "Declaration of Restrictions" establishing the general plan of equitable servitudes. After the "Declaration of Restrictions" was recorded but before the conveyance of lot 17, Anderson, on

---

recordation of the first deed which effectively imposes restrictions on the land conveyed and that retained by the common grantor, the restrictions are binding upon all subsequent grantees of the parcel so affected who take with notice thereof *notwithstanding that similar clauses have been omitted from their deeds.*" (Italics added.)

[7]The record before us casts some doubt as to whether the 1967 conveyance transferred the entire interest in lot 17 to plaintiffs. The original grant from Anderson was to "Larry Shields and Bruce Young, SINGLE MEN, an undivided one-half interest each. . . ." The grant deed to plaintiffs, however, lists only Larry Shields as grantor and his is the only signature appearing thereon (other than the signature of the notary public).

November 14, 1964, borrowed an additional $50,000 from Valley Federal. On May 13, 1965, Anderson borrowed an additional $35,000. There is a dispute as to whether the subsequent borrowings were actually secured by the 1963 deed of trust and, if they were so secured, whether the security for these borrowings or further advances was junior to or senior to the recorded "Declaration of Restrictions."

After conveying lots 17, 9 and 10, Anderson defaulted on the loans to Valley Federal. On October 28, 1966, Valley Federal filed notice of default and election to sell under the deed of trust. The notice of default and election to sell indicated that Anderson was in default on the $300,000 indebtedness plus "one additional note dated November 4, 1964, for $50,000" and "one additional note dated May 13, 1965, for $35,000." A foreclosure by private sale occurred and on May 15, 1967, Valley Federal recorded a trustee's deed upon sale to it as purchaser. The trustee's deed reflects that the deed of trust was security for three promisory notes.

On the first day of trial there was a stipulation between the parties that the foreclosure by Valley Federal was based upon a default of Anderson on "the additional lots [loans?] of $35,000 and $50,000, as well as the original loan." It was also stipulated on the first day of trial that Valley Federal had actual knowledge of the contents of the "Declaration of Restrictions" on May 13, 1965.

On July 10, 1967, Valley Federal conveyed lot 18 to defendants' predecessor in interest. This deed was recorded July 20, 1967. After a conveyance to an intermediate party, lot 18 was conveyed to defendants by grant deed dated October 18, 1972, and recorded November 1, 1972. These deeds did not incorporate by reference, or otherwise, the "Declaration of Restrictions."

One of the defendants, Mr. Silvestre, testified that the preliminary title report that he received prior to the close of escrow for lot 18 did refer to the "Declaration of Restrictions" recorded in 1964 but he "wasn't so concerned about it." As already mentioned, a subsequent grantee who has actual notice of equitable servitudes is bound by them although no statement or declaration of restriction or reference thereto is contained in his individual deed. (*Riley* v. *Bear Creek Planning*

*Committee, supra,* 17 Cal.3d 500, 507; see *Arrowhead Mut. Service Co.* v. *Faust* (1968) 260 Cal.App.2d 567, 580-581 [67 Cal.Rptr. 325].) As the defendants, by Mr. Silvestre, admitted that they received the title information and read the same and that it contained information concerning the existence of the "Declaration of Restrictions," they not only had constructive notice of the servitudes by virtue of the recording statutes but they had actual notice of the existence of the restrictions.

In summary, the equitable servitudes created by the common grantor, Anderson, satisfied the requirements of the California law governing their creation by virtue of the recorded "Declaration of Restrictions" containing the general plan and stating an intention to benefit all lots in the affected tract, describing all of the lots affected, and by the subsequent conveyance by deed of the common grantor, Anderson, of lots 17 and then 9 and 10, in which the "Declaration of Restrictions" was incorporated by reference. It was at the time of the conveyance of lot 17 that the equitable servitudes "sprang into existence."[8]

But for the intervening foreclosure, which will be discussed, *infra,* defendants who had both actual and constructive notice of the restrictions by virtue of the recording statutes and their receipt of the title report containing information about the restrictions, would have been bound by the reciprocal or mutual equitable building restrictions, including the obligation not to unreasonably obstruct the view of lot 17, the dominant tenement owned by the plaintiffs.[9]

---

[8]At the time plaintiffs filed their lawsuit, they were owners of lot 17 and had a right to enforce the building restrictions. It appears from the facts recited in defendants' motion for new trial that plaintiffs are no longer the owners of lot 17. As the judgment will be reversed and there may be a new trial, we do not now decide whether the plaintiffs have a right to continue this action for damages against defendants by virtue of the violations of the building restrictions at the time plaintiffs filed their lawsuit against defendants. (See *Kent* v. *Koch* (1958) 166 Cal.App.2d 579, 583-589 [333 P.2d 411].)

[9]There is no question from the record that the building restrictions gave to the plaintiffs, as owners of the dominant tenement, the right to a reasonable "view toward Coldwater Canyon" unobstructed by any structure erected on the land by the servient tenement, the defendants' property. Applying the rule of reasonable construction, it is clear that the term in the restriction, "the view toward Coldwater Canyon" must be interpreted to mean a view in the direction of the canyon and not just a view of the canyon proper. (*Hannula* v. *Hacienda Homes* (1949) 34 Cal.2d 442, 444-445 [211 P.2d 302, 19 A.L.R.2d 1268]; *Lincoln Sav. & Loan Assn.* v. *Riviera Estates Assn.* (1970) 7 Cal.App.3d 449, 463 [87 Cal.Rptr. 150]; *Seligman* v. *Tucker, supra,* 6 Cal.App.3d 691; *Coppotelli* v. *Dawson* (1969) 269 Cal.App.2d 731 [75 Cal.Rptr. 214]; *Petersen* v. *Friedman* (1958) 162 Cal.App.2d 245 [328 P.2d 264].)

## THE FORECLOSURE, BY PRIVATE SALE, OF THE DEED OF TRUST SECURING THE $300,000 INDEBTEDNESS BORROWED BY ANDERSON, THE COMMON GRANTOR AND TRACT DEVELOPER, ELIMINATED THE MUTUAL EQUITABLE SERVITUDES AS TO DEFENDANTS' PROPERTY

The recorded security interest in the entire tract, the deed of trust recorded August 27, 1963, with the common grantor-developer, Anderson, as the trustor-borrower, and with Valley Federal as the beneficiary-lender, had priority to and was senior to the "Declaration of Restrictions" which was recorded October 14, 1964. Upon the foreclosure by the trustee's sale on May 10, 1967, after the default of Anderson, and the recording of the trustee's deed upon sale on May 15, 1967, Valley Federal, as purchaser at the trustee's sale and the grantee in the trustee's deed, acquired title free from the equitable servitudes or building restrictions which were recorded by Anderson subsequent to the recording of the deed of trust. (See *Hohn v. Riverside County Flood Control etc. Dist.* (1964) 228 Cal.App.2d 605, 613 [39 Cal.Rptr. 647]; *Bracey v. Gray* (1942) 49 Cal.App.2d 274, 277-278 [121 P.2d 770].) Lots 9, 10 and 17 were excluded from the trustee's deed and as between those lots, which includes plaintiffs' lot, the mutual equitable servitudes survived. The equitable servitudes were eliminated as to any other lot in the tract, including lot 18, thus making the building restrictions uninforceable against defendants as the owners of lot 18.

 The foreclosure sale was conducted in accordance with the conditions set forth in the power of sale.[10] The sale was fairly made and good title passed to the purchaser, Valley Federal, upon the consummation of the conveyance, free and clear of the equitable servitudes, except as mentioned above (see *Brown v. Copp* (1951) 105 Cal.App.2d 1, 6 [232 P.2d 868]) as of the date of the recording of the deed of trust on August 27, 1963. (*Hohn v. Riverside County Flood Control etc. Dist., supra,* 228 Cal.App.2d 605, 612; *Bracey v. Gray, supra,* 49 Cal.App.2d 274, 277-278.)

 The additional loans of $50,000 on November 4, 1964, and of $35,000 on May 13, 1965, made by Valley Federal to Anderson after the

---

[10]There is a presumption that the sale under a deed of trust was conducted regularly and fairly. (*Brown v. Busch* (1957) 152 Cal.App.2d 200, 204 [313 P.2d 19].) No evidence was offered to overcome this presumption.

recording of the "Declaration of Restrictions," did not affect in any way the priority of the deed of trust to the extent that it secured the $300,000 obligation. If these additional loans permitted by the 1963 deed of trust (herein sometimes referred to as "future advances") did not relate back in time to the recording of the deed of trust on August 27, 1963, the only effect was that the *security for the future advances was junior to the "Declaration of Restrictions."* (*Atkinson* v. *Foote* (1919) 44 Cal.App. 149, 159-162 [186 P. 831].)

Plaintiffs appear to contend that when Valley Federal loaned the addition sum of $85,000 to Anderson, after the "Declaration of Restrictions" was recorded, the priority of the deed of trust as security for the indebtedness of $300,000 became junior to the "Declaration of Restrictions," i.e., the deed of trust securing the original indebtedness lost its priority of enforcement to the "Declaration of Restrictions." This contention is contrary to the law.

When the beneficiary-lender is not bound to make the future advances, priority as to the *security for the future advances* is determined by the circumstances existing at the time the particular advances were made. The record discloses that certain documents, received in evidence without objection, stated that the future advances were optional.

If the future advances were optional and if the beneficiary-lender had actual notice of other liens, including the recorded equitable servitudes, those other liens had priority only with respect to the security *for those future advances.* (*Oaks* v. *Weingartner* (1951) 105 Cal.App.2d 598 [234 P.2d 194]; *Atkinson* v. *Foote, supra,* 44 Cal.App. 149, 159-161.)

Whether the future advances were optional or obligatory or whether the lender, Valley Federal, had actual knowledge of the intervening liens is inconsequential to the issue presented here since the priority of the deed of trust securing the original indebtedness was not affected by the future advances. (Cf. *Western Loan & Bldg. Co.* v. *Scheib* (1933) 218 Cal. 386 [23 P.2d 745], holding that the priority of a recorded deed of trust commences when the debt it secures is created.) There is no evidence in the record on appeal that would permit a conclusion that the priority of Valley Federal's security interest for the original indebtedness of $300,000 was lost or became inferior to the mutual equitable servitudes because of the future advances.

 There is also no evidence in the record that the purchaser at the trustee's sale, Valley Federal, consented to the establishment of the restrictions, such as by approving or consenting to the recording of the "Declaration of Restrictions" and/or any subdivision map or general plan. Such participation in the creation of the servitudes by Valley Federal might have been grounds for enforcing the mutual equitable servitudes against Valley Federal and its grantees since under such circumstances "equity could not in conscience withhold relief." (*Richardson* v. *Callahan* (1931) 213 Cal. 683, 686 [3 P.2d 927]; see *Thew* v. *Thew* (1939) 35 Cal.App.2d 691, 699 [92 P.2d 826].) Mere knowledge by Valley Federal of the developer's general plan and of the recorded "Declaration of Restrictions" is not, however, sufficient evidence of such consent or approval.

The record does not disclose that Valley Federal represented to subsequent lot purchasers that restrictive conditions existed or continued to exist on the lots or that Valley Federal claimed that the benefits of the equitable building restrictions accrued to its lots which were for sale.

As the record fails to disclose any evidence which would permit the court under some equitable doctrine to grant relief and enforce these mutual servitudes as to lots conveyed by Valley Federal, the plaintiffs cannot enforce them against the defendants. The fact that Valley Federal conveyed the lots by deeds which made no reference even by incorporation to the "Declaration of Restrictions" is an indication that it was not claiming the benefits of the servitudes. (See *Hanna* v. *Rodeo-Vallejo Ferry Co.* (1928) 89 Cal.App. 462, 467 [265 P. 287], where the grantors had omitted the restrictions from many of the deeds and it was held that they had thereby waived the right to enforce them against a lot owner; see also *Maderis* v. *Pattavina* (1941) 46 Cal.App.2d 615, 617 [116 P.2d 495]; *Bernstein* v. *Minney* (1929) 96 Cal.App. 597, 599 [274 P. 614].)

One authority suggests that the foreclosure of a lien or charge that is superior to mutual equitable servitudes *may* not eliminate the restrictions. 2 Bowman, Ogden's Revised California Real Property Law, *supra,* section 18.33, page 963, states the general rule as follows: "The purchaser at a trustee's sale acquires all right, title, and interest of the security instrument maker on the date the security instrument became a charge . . . . The purchaser takes title . . . , as a general rule, free of subsequently recorded encumbrances." Bowman, *supra,* then states: "However, certain encumbrances subsequent in time to the security instrument *may* not be eliminated by the sale. For example, deed restrictions may remain in

effect, and the rights of other lot owners to enforce a general plan of tract restrictions may be unimpaired by the trustee's sale." (Italics added.) Amplifying on this proposition, Bowman, *supra,* at section 23.36, pages 1163-1164, suggests that the equitable servitudes *may* be enforced as to those lots which were not subject to the deed of trust at the time of the foreclosure. As was noted previously, lots 17, 9 and 10 had been released from the deed of trust prior to the foreclosure, thus permitting the restrictions to continue as between those three lots. The restrictions, however, are not ordinarily enforceable as between the foreclosure purchaser and the lots that are still to be conveyed. Bowman, *supra,* at page 1163, states, as we have pointed out, that the remaining lots conveyed by the foreclosure purchaser, here Valley Federal, may be found to be burdened and benefited by the mutual equitable servitudes if there is proof that the foreclosure purchaser consented to the establishment of the restrictions, made an agreement to continue the restrictions with the subsequent grantees of the remaining lots, represented to subsequent lot purchasers that the restrictions were effectively imposed, or upon evidence that the foreclosure purchaser claims that the benefits of the restrictions accrue to its remaining lots. There is nothing in the record which suggests that Valley Federal has done any of the things mentioned by Bowman.

Bowman, *supra,* does cite, at page 1163, two Maryland cases which held that the foreclosure sale passes title to the foreclosure purchaser which is free of any restrictions which did not attach prior to the trust deed. (See *Boyd* v. *Park Realty Corporation* (1920) 137 Md. 36 [111 A. 129]; *Sullens* v. *Finney* (1914) 123 Md. 653 [91 A. 700], Annot. (1939) 119 A.L.R. 1117.) One Oklahoma case did permit enforcement of the restrictions after foreclosure among the owners of the lots which had been previously released from the mortgage. (See *Magnolia Petroleum Co.* v. *Drauver* (1938) 183 Okla. 579 [83 P.2d 840].)

Mutual equitable servitudes and other restrictive covenants are to be strictly construed as limitations on the free use of property. (*Wing* v. *Forest Lawn Cemetery Assn., supra,* 15 Cal.2d 472, 479.) As Valley Federal did not evidence an intent or a consent to be bound by the building restrictions or an intent to pass the restrictions on to its grantees, including defendants' predecessors in interest, plaintiffs in this case cannot enforce the building restrictions against defendants, whose title and property interests are traced back to the deed of Valley Federal, which was free from the equitable servitudes, and not to the developer, Anderson, who had created the general plan of restrictions.

We reject plaintiffs' contention that an equitable servitude or a building restriction is not an encumbrance which is eliminated by the foreclosure of a senior lien. An equitable servitude is an encumbrance on the title of the property. (*Fraser* v. *Bentel* (1911) 161 Cal. 390, 394 [119 P. 509]; *Evans* v. *Faught* (1965) 231 Cal.App.2d 698, 706 [42 Cal.Rptr. 133]; *George* v. *Colvin* (1950) 98 Cal.App.2d 57, 60-61 [219 P.2d 64].) The building restrictions were therefore eliminated by the foreclosure by private sale of the deed of trust securing the original indebtedness.

As we reverse the judgment, it is unnecessary to consider any of the defendants' other contentions.

### ATTORNEYS' FEES

 Defendants, as the prevailing parties on this appeal, seek attorneys' fees under the provisions of the recorded documents creating the equitable servitude and, in particular, the language of the "Declaration of Restrictions."

The attorney's fees provision of the "Declaration of Restrictions" provides that "[i]n any legal or equitable proceeding for the enforcement or to restrain the violation of this Declaration or any provision thereof, the losing party or parties shall pay the attorney's fees of the winning party or parties in such amount as may be fixed by the Court in such proceeding."

The attorney's fees provision in the declaration is bilateral. The request for attorney's fees in this case is controlled by the provisions of Civil Code section 1717.[11] (See *Beneficial Standard Properties, Inc.* v. *Scharps* (1977) 67 Cal.App.3d 227, 231-232 [136 Cal.Rptr. 549], holding that Civ. Code, § 1717 is applicable whether the contractual attorney's

[11]Civil Code section 1717 provides:

"In any action on a contract, where such contract specifically provides that attorney's fees and costs, which are incurred to enforce the provisions of such contract, shall be awarded to one of the parties, the prevailing party, whether he is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to costs and necessary disbursements.

"Attorney's fees provided for by this section shall not be subject to waiver by the parties to any contract which is entered into after the effective date of this section. Any provision in any such contract which provides for a waiver of attorney's fees is void.

"As used in this section 'prevailing party' means the party in whose favor final judgment is rendered."

fee provision is unilateral or bilateral, and that the prevailing party will be entitled to attorney's fees as costs.)

The fact that the "Declaration of Restrictions" is not enforceable against the appellants because it was extinguished or eliminated by the foreclosure would not prevent an award of attorneys' fees if appellants or their predecessors in interest were parties to the contract. (*Care Const., Inc.* v. *Century Convalescent Centers, Inc.* (1976) 54 Cal.App.3d 701, 706 [126 Cal.Rptr. 761].) Defendants contend that the mutual equitable servitudes are not binding on them. For the reasons stated in the previous discussion, they are correct. Defendants are not, however, parties to, or privies to, the contractual provisions providing for an award of attorneys' fees to the prevailing party since their title derives from Valley Federal, which was not a party to those provisions; defendants, therefore, cannot be awarded such fees. (*Arnold* v. *Browne* (1972) 27 Cal.App.3d 386, 398-399 [103 Cal.Rptr. 775].)

(11) There is an additional reason why the attorneys' fees award cannot be made at this time. The "Declaration" provisions provide that the "losing" party will pay attorney's fees. At this time there is no losing or winning party. The reversal of the judgment contemplates a retrial.

The judgment is reversed.

Potter, Acting P. J., and Allport, J., concurred.