[Civ. No. 33961. Second Dist., Div. Five. May 8, 1970.]

LINCOLN SAVINGS AND LOAN ASSOCIATION,
Plaintiff and Appellant, v.
RIVIERA ESTATES ASSOCIATION et al., Defendants and Respondents.

**COUNSEL**

John L. Mace for Plaintiff and Appellant.

Horton & Foote, Joseph K. Horton and James D. Stuart for Defendants and Respondents.

**OPINION**

**STEPHENS, J.**—Plaintiff appeals from an adverse judgment in a declatory relief action. The subject of the action is a narrow strip of property (hereafter termed the driveway or the subject property) in lot 56 of the Riviera, an expensive single family residential area of 150 homes in the City of Los Angeles. Each home site in the tract has a frontage of 100 feet or more. With the exception of four vacant lots, the home sites have a middle value of $130,000 while some have a value as high as $200,000. The home owners in that tract are the members of the Riviera Estates Association, a nonstock corporation. The association and several individual

home owners are the defendants herein. Plaintiff, the fee owner of the driveway seeks a declaration that it may use it as a driveway to provide ingress and egress for two lots it owns immediately outside the Riviera tract. Hereafter these two lots will be referred to as Parcel 2 Coleman and Parcel 3 Coleman. The driveway opens upon Amalfi Drive, a public street within the Riviera. This proposed driveway would extend a distance of more than 126 feet from Amalfi Drive to the two parcels, and be of a width of 21.03 feet. The defendants contend that such a use of the subject property would violate the recorded subdivision restrictions of the Riviera tract.

As of April 14, 1925, the Riviera Corporation, the assignor of the rights of the Riviera Estates Association, was the owner of all the land known as the Riviera. On that day the Riviera Corporation recorded a "Declaration of Covenants, Conditions and Charges" in the official records of the County of Los Angeles. The declaration affected all of the property. All of the conditions, covenants and charges set forth in this declaration were to continue in force until November 1, 1964, and could be extended from time to time to all or part of the property for periods not exceeding ten years, by the assent, evidenced by appropriate agreement, of the owners of more than one-half in area of the property in the Riviera. On January 27, 1960, a declaration signed by the owners of more than one-half in area of the property in the Riviera was recorded in the official records of Los Angeles County, whereby it was agreed that the provisions of the original declaration would remain in force for a continued period of ten years commencing November 1, 1964 and expiring October 31, 1974. The plaintiff and plaintiff's predecessors in title to the subject property did not join in the execution of this latter agreement.

Clause 4 of the original declaration provided in part: "No store, grocery or mercantile business of any kind shall be maintained or carried on upon said property; nor shall any of said property (except the streets, parks and open spaces intended for the general use of the owners of the property shown on said map) be used for any purpose other than residence purposes; nor shall any building be erected or maintained upon any lot or parcel of said property except a private dwelling house not more than two (2) stories in height exclusive of finished attic, if any, and with or without basement or cellar, and outhouses hereinafter permitted. Each such dwelling house shall be designed and intended for occupation by not more than one family; flats, double houses, apartment houses, tenement houses, hotels and public boarding or lodging houses being expressly prohibited. . . ."

Clause 6 of the original declaration provided in part: "No building, fence, wall or other structure shall be erected or maintained upon any building site, nor shall any alteration for which it is necessary to secure a

permit from the [B]oard of Public Works of Los Angeles be made in the exterior of such structures, unless complete plans and specifications therefor showing the nature, kind, shape, height, material and color scheme thereof, and block plan indicating the location of such structure or of such altered structure on the building site, and, when specifically requested, the grading plan of the building site to be built upon, shall have been submitted to, approved in writing by, and a copy of such plans and specifications, block plan (and grading plan if requested) as finally approved, deposited permanently with The Riviera Estates Association. . . ."

Clause 8 of the original declaration provided in part: "No more than one dwelling-house shall be built upon any one building site without the written permission of the Riviera Corporation or, with its authority, The Riviera Estates Association. A building site shall be either a lot as shown on said map, or a parcel composed as follows:

"(a) of a portion of any lot, other than a corner lot, provided that such parcel shall have a frontage of not less than one hundred (100) feet; or

"(b) of portions of any two or more contiguous lots other than corner lots, provided that such parcel shall have a frontage of not less than one hundred (100) feet; or

"(c) of any two or more contiguous lots, or of any lot or contiguous lots and a portion of, or portions of, any lot or lots other than a corner lot and contiguous to said lot or lots. . . ."

All of the rights of the Riviera Corporation under the original declaration were assigned by it to the Riviera Estates Association on February 8, 1937.

On July 8, 1925, the Riviera Corporation conveyed lot 56, containing the proposed driveway area which constitutes the subject property, to Mark R. Daniels. After a series of mesne conveyances, the property was purchased by Elisabeth M. Lawrence on April 9, 1932. Elisabeth Lawrence thereafter purchased additional property adjacent to lot 56, but outside the Riviera. This latter property included the two lots now owned by plaintiff, Parcel 2 Coleman and Parcel 3 Coleman. Her purchase included that portion of lot 56 subsequently known as Parcel 4 Carter, which was within the tract. Lot 56 and the adjacent property were purchased by Occidental Life Insurance Company on August 21, 1939. On January 24, 1940, Occidental conveyed all the property to Douglas Fairbanks, Jr., and his wife, Mary Lee Fairbanks.

Mr. and Mrs. Fairbanks occupied the entire parcel, lot 56 plus the adjacent property outside the Riviera, as a home, with improvements consisting of a residence, a tennis court, a swimming pool, a bathhouse, and a pagoda tree deck. On January 18, 1957, Mr. and Mrs. Fairbanks conveyed

the property to Dorothy K. Durney. Mrs.Durney and her husband occupied the property in the same manner as had the Fairbanks until December 16, 1958. Between December 16, 1958 and March 24, 1961, Mrs. Durney conveyed small portions of her property to third parties. On January 31, 1962, in subdividing her property, seeking to create legal building sites pursuant to Los Angeles Municipal Code section 12.03, Mrs. Durney executed and recorded three documents. Each was entitled "Covenant and Agreement to Hold Property as One Parcel" and was approved for recording by the City of Los Angeles, Department of Building and Safety. The first and second documents are relevant to the instant case. The first document described Parcel 2 Coleman, together with the southerly one-half of the proposed driveway. The address of this property was described in the document as 1517 Amalfi Drive. The second document described Parcel 3 Coleman, together with the northerly portion of the proposed driveway. The address of this property was described as 1519 Amalfi Drive. The third document described Parcel 4 Carter and listed its address as 1521 Amalfi Drive. No defendant knew of or consented to the execution or recording of any of these documents.

Between March 23, 1962 and April 6, 1962, Mrs. Durney conveyed all of her property to various third parties. She conveyed to Mattison B. Coleman Parcel 2 Coleman, Parcel 3 Coleman, and the portion of lot 56 known as Parcel 4 Carter, which is located between Parcels 2 and 3 Coleman and Amalfi Drive, including the driveway area in question. In order to secure two promissory notes payable to plaintiff, Mr. Coleman executed two deeds of trust, with Reliable Title Company as trustee for the benefit of plaintiff, as beneficiary. One deed of trust covered Parcel 2 Coleman, together with the southerly portion of the driveway. The other deed of trust covered Parcel 3 Coleman, together with the northerly portion of the driveway. No defendant had any knowledge of plaintiff's loans to Mr. Coleman.

The following diagram [see, *infra,* p. 456] is included for purpose of clarity.

Prior to the making of these loans, the Riviera Estates Association notified Mr. Coleman in writing that the use of the subject property as a street or driveway to the two lots outside the Riviera would be in violation of the Riviera subdivision restrictions and would be opposed by the association. On November 15, 1962, after the two deeds of trust were recorded, the Riviera Estates Association and others filed action number 808,120, seeking a declaration that the use of the driveway or road would be a violation of the subdvision restrictions. (A final judgment in that action in favor of the association, et al., was rendered on June 10, 1964.) On August 30, 1963, Mr. Coleman conveyed Parcel 4 Carter to Mr. and

[PROPOSED DRIVEWAY]

[May 1970]

Mrs. William H. Carter, thereby making parcels 2 and 3 Coleman land-locked, without access to Amalfi Drive.

Thereafter, Mr. Coleman defaulted in the payment of the two promissory notes, and on June 30, 1965, Reliable Title Company as trustee caused the property described in the two deeds of trust to be sold at public sale to the plaintiff. The trustee's deeds were recorded on February 17, 1966, and since that time, plaintiff has been the owner in fee simple absolute of Parcel 2 Coleman, Parcel 3 Coleman, and the driveway or driveways.

Prior to making the loans to Mr. Coleman plaintiff had obtained a preliminary title report which set forth that the driveway was covered by the restrictions of the original declaration of April 14, 1925. After it made the loans, plaintiff received a policy of title insurance which also disclosed these restrictions.

Adjoining Parcel 2 Coleman and Parcel 3 Coleman to the south, and outside the Riviera, is a parcel of property 30 feet in width, at one time dedicated as a public street or road, but never used or improved as such, known as Fermo Drive. Fermo Drive was dedicated on August 11, 1927, but subsequently was vacated to a point approximately 280 feet north of Romany Drive. The abandonment ordinance was adopted pursuant to a petition filed with the city council and consented to by various persons owning property abutting on Fermo Drive, including Douglas Fairbanks, Jr. and Mary Lee Fairbanks, the then owners of Parcel 2 Coleman and Parcel 3 Coleman.

The court determined that the total cost of improving and surfacing Fermo Drive and constructing driveways to the proposed building sites on Parcel 2 Coleman and Parcel 3 Coleman would be $94,470. This cost includes a 20 percent contingency allowance of $15,700. In making its determination of cost, the court assumed that slope easements could be obtained from the owners of other land abutting on Fermo Drive. The separate cost of surfacing and improving Fermo Drive, included in the foregoing total, is $30,630, and the separate cost of constructing driveways to these buildings sites, included in the foregoing total, is $48,140.

On August 26, 1958, Dorothy K. Durney had conveyed all her road rights in Fermo Drive to Nathaniel P. and Margaret F. Green with the provision that if Fermo Drive should ever be reconverted into a city street, Mrs. Durney would have the same rights as any other property owner. At all times since this conveyance, Nathaniel and Margaret Green have exclusively occupied all of the vacated portions of Fermo Drive conveyed

to them and openly claim to be the owners of these portions. From the time of this conveyance, neither Mrs. Durney nor her grantees had any interest in Fermo Drive.

On April 8, 1966, the plaintiff recorded a "Declaration of Covenants, Conditions and Charges" restricting the use of Parcel 2 Coleman and Parcel 3 Coleman to single family residences and restricting the use of the driveway to that of a private road to provide ingress to and egress from those parcels.

The court found that there had not been any breach of the restrictions of the original tract declaration, nor any deviation from the plan of development set forth in the declaration, and there are no changed conditions affecting the plan of development.

The court further found that there is a dedicated public alley 20 feet in width extending across lot 55 of the Riviera from Amalfi Drive to Umeo Road. The alley connects Umeo, which would otherwise be a cul-de-sac, with Amalfi. This alley was dedicated by Fairbanks and others to the City of Los Angeles on or about August 11, 1949. Only defendant Ferguson knew of this proposed dedication and he objected by refusing to sign a consent to it. He did not believe any further objection was necessary.

The court determined that no driveway has been installed on any property located within the Riviera which is used for ingress and egress between any property lying outside the Riviera and any public street within the Riviera. There are other properties in the Riviera where it is physically feasible to construct a driveway through Riviera property to property outside the Riviera, and therefore develop that latter property.

The court found that if access to Parcel 2 Coleman can be obtained from Amalfi Drive, the value of the parcel is $50,000. If access can be had from Fermo Drive, the value is $35,000. Without access from either Amalfi Drive or Fermo Drive, the parcel has a nominal value of $500 to $1,500. If access to Parcel 3 Coleman can be obtained from Amalfi Drive, its value is $60,000. If access can be obtained from Fermo Drive, the value is $40,000. If no access can be obtained from either Amalfi Drive or Fermo Drive, the parcel has a nominal value of $500 to $1,500.

In essence, then, through a series of conveyances plaintiff has found itself in possession of two parcels of property which can only be entered by constructing a driveway over a strip of land subject to the restrictions of the Riviera subdivision, or by building a road on the other side of the parcels at an estimated cost of $94,470. The court below found that plaintiff's proposed use of the subject property would violate the subdivision restrictions, especially that restriction prohibiting the use of Riviera

property for nonresidential purposes, and enjoined plaintiff from using the property as a private driveway.

■ Plaintiff argues that it is entitled to use the subject property as a driveway to its two parcels as it is a way of necessity. The difficulty with this argument is that plaintiff stands in the shoes of Coleman, and Coleman, owning all of the property involved, had no "way of necessity" until he effectively "landlocked" himself. This does not create a right of way by necessity. (See *Reese* v. *Borghi*, 216 Cal.App.2d 324, 332-333 [30 Cal.Rptr. 868].)

Since Mrs. Durney conveyed all her road rights in Fermo Drive to Nathaniel and Margaret Green, access by means of Fermo Drive seems impossible unless it is reconverted into a city street. Actually, the Fermo Drive issue is a red herring. Coleman took all the Durney interests, and was confronted with the fact that Fermo Drive (which was now separately owned) had been the contemplated means of access to plaintiff's property, not lot 56 of the Riviera. Mrs. Durney could not, by carving a narrow strip out of lot 56 of the Riviera to serve Parcels 2 and 3 Coleman, alter the restrictions on the property that existed when she acquired the land. By her "subdividing," she did not have the power to gain rights in Riviera property she did not already have; nor did such a property interest come into existence through the conveyance by Durney of all of her interests to Coleman.

The way of necessity which is claimed was not created by the Riviera Estates Association, the entity against whom a right-of-way-by-necessity is asserted, nor its assignor, the Riviera Corporation. Plaintiff's parcels did not become cut off from Amalfi Drive until Mr. Coleman conveyed Parcel 4 Carter to Mr. and Mrs. Carter. Mr. Coleman could not by such a conveyance circumvent the restrictions that controlled the driveway, as part of the Riviera, when he acquired it. The facts of the instant case do not present the situation of a grantor conveying land which is landlocked by the grantor's remaining land, for the purchaser took with knowledge of the restrictions. No right-of-way-by-necessity exists.

■ Plaintiff further argues that there is no privity of contract or estate between plaintiff and defendants, and that the restrictions must therefore be enforced as equitable servitudes, rather than as covenants running with the land. (See *Mara* v. *Aetna Constr. Co.*, 15 Cal.2d 375 [101 P.2d 490]; *Werner* v. *Graham*, 181 Cal. 174 [183 P. 945].) Citing *Wing* v. *Forest Lawn Cemetery Assn.*, 15 Cal.2d 472, 484 [101 P.2d 1099, 130 A.L.R. 120], plaintiff then contends that equitable servitudes should not be enforced when to do so would be inequitable, unjust, or contrary to public policy. ■ While one of the defendants, the Riviera Estates

Association, is the assignee of all the rights of the original grantor and covenantee, the Riviera Corporation, the latter conveyed the fee to lot 56 without reserving any limitation on the title conveyed, such as a reversion. Therefore there could be no privity of estate between covenantor and covenantee and the benefit of the covenant, rather than running with the land, could only be for the personal benefit of the Riviera Corporation. (*Bresee* v. *Dunn,* 178 Cal. 96 [172 P. 387].) It follows that the Riviera Estates Association and the other defendants are only entitled to enforce the restrictions as equitable servitudes.

We do not, however, believe that it would be inequitable to enforce the restrictions as equitable servitudes. The courts normally refuse to enforce servitudes on equitable grounds when a change in the neighborhood practically defeats the purpose of the restrictions and they are of no benefit to the remaining property owners. (*Atlas Terminals, Inc.* v. *Sokol,* 203 Cal.App.2d 191 [21 Cal.Rptr. 293]; Note, *Restrictive Covenants: Injunctions: Changed Conditions in the Neighborhood as a Bar to Enforcement of Equitable Servitudes,* 16 Cal. L.Rev. 58.) The trial court in the instant case determined that there have been no changes in the neighborhood which would render the conditions obsolete,[1] and the continued enforcement of the restrictions would be of substantial benefit to the other home owners in the tract. Under these facts, it is not inequitable to enforce restrictions on the use of land even though unrestricted use of the property would be more profitable to the owner. (*Atlas Terminals, Inc.* v. *Sokol, supra.*) In the *Atlas* case the court approved the trial judge's statement that when a plaintiff purchases property with full knowledge of restrictions upon it, though in a bona fide belief that they are unenforceable, the application of any overriding equity in favor of the plaintiff is precluded. Moreover, Fermo Drive, not lot 56, had been the planned means of access to plaintiff's two parcels. Plaintiff either knew or should have known this fact when it first acquired an interest in the property. It should have considered the cost of making Fermo Drive useable, and even the total unlikelihood of its availability for development, when it made its decision to invest in the parcels. The facts do not demonstrate any overriding equity in plaintiff's favor.

The plaintiff next contends that the extension of the restrictions for the additional 10 years is not enforceable as to it, because restrictive covenants cannot be imposed upon land without the consent of the land-

---

[1]The only possible change in the neighborhood which could be relevant to this case is the public alley constructed across lot 55 of the Riviera. However, this alley was constructed by the City of Los Angeles as part of its system of public streets. The city could not be controlled by any private agreements restricting the use of the property. (*Friesen* v. *City of Glendale,* 209 Cal. 524 [288 P. 1080].)

òwner. However, this is not a case where new restrictions are being imposed upon plaintiff's land. When plaintiff and its predecessors acquired title to the subject property, they took subject to the existing tract restrictions. These restrictions included the likelihood that the owners of over one-half of the acreage within the tract would cause an extension of the term of the restrictions as was their right to do. Plaintiff and its predecessors in title had constructive knowledge of such a possibility, and by taking possession, impliedly agreed to be bound by the results of such contingency and took subject thereto.

Having found that the driveway is impressed with the tract restrictions, we must determine whether these restrictions prohibit the use of the driveway as a driveway or street between Amalfi Drive and plaintiff's two parcels.

The trial judge indicated that he based his decision primarily upon the restriction against nonresidential use. On appeal, defendants rely upon both this restriction and the clauses requiring all building sites to have a minimum frontage of 100 feet. Plaintiff argues that a private driveway to property restricted to residential use is in itself a residential use of property and does not violate that restriction.

Neither side has cited, and we have been unable to find, any California cases directly determinative of the issue whether or not a driveway to a residence constitutes a residential use. (Obviously it would *contribute* to or be a part of such use.) In *Friesen* v. *City of Glendale; supra,* 209 Cal. 524, cited by plaintiff, the city purchased a strip of land in a tract restricted by private agreement to "residence purposes only." The plaintiffs sought to enjoin the city from constructing a public street on this property. The court first noted that the use of a portion of the land in the tract for public street purposes was not only consistent with the use of the remaining land for residence purposes, but might be essential to the continuation and preservation of the rest of the tract for that use. It is of course obvious that the same necessity does not exist in the instant case. The court in *Friesen* went on to state that the restrictions had to be construed strictly, resolving any doubt in favor of the free use of the land. The court said that such a rule of construction was especially applicable when title to land is acquired by a municipality for street purposes. But the court refused to rest its decision solely upon the ground that the restriction did not prohibit the use of the land as a street. The court held that the city could not be bound by a private agreement to which it was not a party.

In *Barbieri* v. *Ongaro,* 208 Cal.App.2d 753 [25 Cal.Rptr. 471], cited by both parties, the court enjoined the construction of a roadway through land restricted to residential use. The road was designed to serve outside

land where a yacht harbor was to be constructed. The court ruled that under these circumstances, the road did not constitute a residential use under the terms of a three party agreement.

Plaintiff has referred us to five non-California cases, *Bove* v. *Giebel,* 169 Ohio St. 325 [159 N.E.2d 425]; *Lake Beulah Protective & Improv. Assn.* v. *Christenson,* 272 Wis. 493 [76 N.W.2d 276]; *Baxendale* v. *Property Owners Assn. of North Shore Acres,* 285 App.Div. 1148 [140 N.Y.S.2d 176]; *Callaham* v. *Arenson,* 239 N.C. 619 [80 S.E.2d 619, 624]; and *R.R. Improv. Assn.* v. *Thomas,* 374 Mich. 175 [131 N.W.2d 920], where courts either held or suggested that a driveway or street designed to provide access to residential property was a residential use. In *Bove,* the court noted that the outside lots served by the road were subject to the same restrictions as the subdivision in which the defendant sought to build a road. The court indicated that its decision might have been different if the converse were true. In *Beulah,* the court held that a decision permitting construction of a road to a lake front was consistent with the public policy of Wisconsin to provide access for the public to the waters of the state. In *Callaham,* the court held that the construction of a street would provide for the better enjoyment of the surrounding residential property. The court in the *R.R. Improv. Assn.* case held that before it could be determined whether construction of a street through a tract restricted to residential purposes was permissible, the trial court would have to determine whether the present residential advantages enjoyed by the lot owners might be adversely affected; whether a new traffic burden or maintenance problem would be imposed on any of the subdivision's roads; whether the road would aesthetically harm the subdivision; whether the restrictions had been waived; and in general, whether the reasons to prohibit the construction of the road were fair as distinguished from trifling. An application of such principles in the instant case requires an affirmance of the lower court's judgment.

While reliance upon the nonresidential use restriction alone might leave the result of the case in doubt, defendants also rely upon clauses 6 and 8 of the original declaration. Clause 6 provides that no structure shall be erected on any building site, unless the plans are approved by the Riviera Estate Association. Clause 8 provides that a building site must have a frontage of at least 100 feet. Defendants contend that these two clauses, read together, prohibit the use of the subject property as a driveway or street to property outside the Riviera. The purpose of these two clauses is obvious. They represent an attempt by the Riviera corporation to preserve the quality of the Riviera subdivision by prohibiting the construction of homes within the Riviera on lots of less than a certain size. All homes must therefore have a frontage of at least 100 feet. While plaintiff's two

parcels are outside the Riviera, if access to them is permitted over the subject property, they will carry Riviera addresses. Plaintiff is seeking in effect to add residences to the Riviera and take advantage of the subdivision's status without being subject to any of its restrictions or quality controls. If such a course of action is permitted, the nature of the Riviera could be drastically altered. The trial court found that there are many other lots in the Riviera where driveways can be constructed to outside property. A decision favorable to plaintiff would permit other landowners to turn portions of their lots into passageways to adjacent real estate. Moreover, while the land below plaintiff's parcels is presently undeveloped, there is no certainty that it will remain so. The driveway, instead of serving only the two lots, could become a passageway to the equivalent of an entirely new subdivision.

■ It is true that as a general rule, servitudes restricting the use of land will be strictly construed against the party seeking to enforce them, and any doubt will be resolved in favor of the free use of the land. (*Werner* v. *Graham, supra,* 181 Cal. 174 [183 P. 945]; *Friesen* v. *City of Glendale, supra,* 209 Cal. 524.) However, as the court in *Bass* v. *Helseth,* 116 Cal.App.2d 75 [253 P.2d 525, 36 A.L.R.2d 853], stated: "There is no doubt that these rules are correct so far as they go, but they give only part of the picture." The court went on to hold that the intent of the parties and the object of the deed or restriction should govern, giving the instrument a just and fair interpretation. ■ As the court in *Hannula* v. *Hacienda Homes, Inc.,* 34 Cal.2d 442 [211 P.2d 302, 19 A.L.R.2d 1268], observed, "the primary object in construing restrictive covenants, as in construing all contracts, should be to effectuate the legitimate desires of the convenanting parties." ■ We find that the intent of the covenanting parties, as set forth in the restrictions, was to prevent the very type of activity which plaintiff seeks to accomplish.

■ The plaintiff next contends that the court failed to make findings on every material fact. However, the findings that the court did make adequately support the judgment. ■ Plaintiff argues that the court should have determined whether the construction of a driveway would damage the defendant landowners. As indicated, however, so long as the neighborhood has not changed to such extent that the purposes of the restrictions have been destroyed, and so long as the restrictions are still of substantial benefit to the other property owners, they must still be enforced, regardless of whether their violation would cause anyone substantial damage. ■ Plaintiff also urges that the court should have made a specific finding on the issue of whether it would be unjust and inequitable to enjoin the use of the subject property as a driveway. How-

ever, the facts found by the court adequately support a conclusion that such an injunction is not inequitable.

■ Plaintiff finally argues that the court made conflicting findings when it found both that plaintiff had not submitted any plans for a driveway to the defendant association for approval and that the refusal of the defendant association to approve plans for a driveway was reasonable and exercised in good faith. The defendant association made it clear that it would not accept any plans for such a driveway. By affirming the judgment, we hold that no such driveway can be constructed on the driveway area, and the refusal of defendant association to approve plans would be reasonable. The court's finding, viewed in the most reasonable light, is that any future refusal of the defendant association to approve plans for such driveway would be reasonable. In view of our decision, such a finding was not erroneous.

The judgment is affirmed.

Kaus, P. J., and Aiso, J., concurred.

A petition for a rehearing was denied May 22, 1970.