[Civ. No. 24797. Fourth Dist., Div. One. Mar. 31, 1982.]

SUSAN FLEET WELSCH, Plaintiff and Respondent, v.
JOSEPH GOSWICK et al., Defendants and Appellants.

[Civ. No. 26331. Fourth Dist., Div. One. Mar. 31, 1982.]

BETTY GOSWICK et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
SUSAN FLEET WELSCH, Real Party in Interest.

COUNSEL

Karl H. Griesbaum for Defendants and Appellants and Petitioners.

Rich & Nachand and Charles D. Nachand for Plaintiff and Respondent and Real Party in Interest.

No appearance for Respondent.

OPINION

**WORK, J.** —Petitioners Betty and Joseph Goswick seek a writ of prohibition or certiorari related to their appeal (4 Civ. No. 24797) from a trial court order which finds them in violation, but not in contempt, of a stipulated injunctive judgment, orders them to cease and desist operating a residential care facility for six elderly persons, and awards $4,000 in attorney fees to counsel for real party/respondent Susan Fleet

Welsch. They contend extraordinary relief is necessary because the trial court exceeded its jurisdiction in making the order, and the order may be wholly or partly not appealable, being either tantamount to a finding of contempt or partly a consent judgment. The Goswicks have, however, also noticed an appeal from the judgment. We stayed the trial court order pending our review. We treat the matter as a direct appeal and discharge the writ as unnecessary.

The Goswicks essentially contend the court erred as a matter of law in finding their licensed facility operation to be a nonresidential use prohibited by a title covenant mutually agreed to by their predecessors in interest and all others purchasing lots within the Quiet Hills Subdivision. In the alternative, they urge enforcement of the restrictive covenant to prohibit their providing residential care and shelter to six unrelated elderly persons unconstitutionally infringes upon their right of privacy. Because we sustain the Goswicks' first contention, we do not determine the broader issue of whether the constitutional right of privacy will always void private title covenants purporting to restrict a family residence from being used to operate any business in the absence of a showing such use negatively affects the residential character of the neighborhood, either visually or otherwise. (See *People v. Williams* (1976) 16 Cal.3d 663, 667 [128 Cal.Rptr. 888, 547 P.2d 1000]; *People v. Gilbert* (1969) 1 Cal.3d 475, 481, 484-485 [82 Cal.Rptr. 724, 462 P.2d 580]; *Palermo v. Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 65-66 [195 P.2d 1].)

*Factual and Procedural Background*

From 1971 through 1975, the Goswicks' principal business activity was the operation of a nursing home in the City of Escondido. Records reveal they characterized their business as a sole proprietorship providing a service on which they generally reported a small to moderate profit. In 1976, the Goswicks purchased and occupied a 5,500 square-foot home in the Quiet Hills Subdivision of Escondido. Susan Fleet Welsch, also a subdivision homeowner, heads the subdivision's architectural control committee. In 1955, the Quiet Hills declaration of restrictions was recorded against the Goswicks' property and includes as its first restriction: "The property shall be used for single family residential purposes only." The declaration of restrictions does not otherwise define "single family residential purpose" nor does it refer to community care facilities as such.

Upon taking possession, the Goswicks prepared to operate the home as a residential care facility. Shortly thereafter, Welsch sued to enjoin the Goswicks from using their property in such a manner, arguing the proposed use violated the single-family residential purpose restriction. In 1977, the parties entered into a stipulated judgment, reciting (1) the Goswicks are subject to a private restrictive covenant limiting the use of the property to single family residential purposes, and (2) the operation of a "residential rest home or care facility" is not a single family residential purpose. The judgment contained a permanent injunction restraining the Goswicks from operating a residential rest home or care facility on the property.[1]

On January 7, 1980, the Goswicks filed a declaratory relief action (Super. Ct. No. N 14098) seeking to have the stipulated injunctive judgment declared invalid due to changed circumstances in form of recently passed legislation. (See Health & Saf. Code, § 1566 et seq. *infra.*)[2] In July, the trial court (Super. Ct. No. N 7347) issued an "Order to Show Cause Re Contempt" based on a declaration by Welsch that the Goswicks were currently operating a residential care facility for six elderly ladies, violating the injunction and the restrictive covenant. On September 5, 1980, the trial court in the declaratory relief action sustained Welsch's demurrer to the complaint without leave to amend because the relief requested should properly have been directly

---

[1]The judgment provides in relevant part: "IT IS HEREBY STIPULATED . . . that judgment in the above-entitled case be entered as follows:

"I. FOR DECLARATORY RELIEF IN FAVOR OF SAID PLAINTIFF:

". . .

"E. That Paragraph First of the 'Quiet Hills Declaration of Restrictions' (Exhibit 'B' hereto) to which Defendants' title is subject, specifically provides:

"'FIRST: The property shall be used for single family residential purposes only.'

"F. That the operation of a residential rest home or care facility is not a single family residential purpose only and operation of such would be a breach and a violation of the conditions subsequent to Defendants' title.

"G. That the violation of the foregoing would give rise to Plaintiff's right to enjoin Defendants' wrongful use of said property for the aforesaid purpose and/or to re-enter and have title quieted in Plaintiff's name.

"II. FOR A PERMANENT INJUNCTION AGAINST DEFENDANTS:

"Enjoining and restraining Defendants and each of them, and their agents, servants, employees, representatives, and all persons acting under, in concert with, or for them, from operating a residential rest home or care facility on the property described in Exhibit 'C' hereto, or otherwise occupying, using, or maintaining said property in any manner inconsistent with a single family residential purpose only, or in violation of any of the conditions and restrictions contained in their title as set forth in Exhibits 'A' and 'B' hereto."

[2]All statutory references are to the Health and Safety Code unless otherwise specified.

solicited in the injunction action itself.[3] Although the demurrer was sustained, the full record in the declaratory relief action (N 14098) became part of the record in the contempt action (N 7347) by virtue of Welsch's specific request for judicial notice pursuant to Evidence Code section 452, subdivision (d). Those materials were later referred to in various moving papers of the parties.

A hearing on the order to show cause came before the court in May 1981. The record, consisting entirely of declarations and exhibits, established the Goswicks were licensed by the county department of public welfare to provide room, board, and nonmedical care to not more than six elderly coresidents of their home. Signed contracts (entitled Admission Agreement (Boarding Home)) submitted to the trial court showed the Goswicks charged for these services at rates varying from $375 per month to $700 per month (a monthly total of $3,100).[4] The home itself is a large residence with six full bedrooms, four baths, two living rooms and many amenities. The six elderly women currently in residence do not own or operate any automobiles. They require some assistance with housekeeping, shopping and, in some cases, bathing. The Goswicks do not advertise their facility and they employ no one to help operate their home or care for the residents.

By order dated May 14, 1981, the trial court determined the Goswicks' activities violated the injunction previously issued pursuant to the stipulated judgment, and concluded the recently passed legislation had

---

[3]Interestingly, Welsch argued in support of the demurrer that the proper procedure for the Goswicks to have followed was to attack the stipulated judgment by a motion to dissolve the injunction addressed to the issuing court. Since both actions were filed in the same court, the better procedure would have been for the trial court to consolidate them initially and treat the declaratory relief action as a motion to dissolve the injunction.

[4]The contracts variously call for fees to be paid privately, or through social security and/or medicare. Some of the residents are required to give 14 days notice before leaving the facility. Each contract outlines the basic care services the Goswicks agreed to provide for the fee charged as follows: "COST OF CARE: (NO CHARGES WILL BE MADE OTHER THAN STIPULATED BELOW)

"Base rate includes the following services: room, board (three nutritious meals daily), a thorough cleaning and linen change weekly, transportation to doctor within a reasonable radius, personal laundry, access to a program of social recreational activities suited to this resident, daily observation of resident's health, and supervision of medication. Help with personal cleanliness and grooming as necessary. Food will be delivered for temporary illness.

"No increase in rate will be made without prior approval of Community Services Division or Department of Public Welfare where Resident receives Public Assistance.

"Payment will be made: [X] in advance [ ] end agreed period"

no effect on the injunction. It declined to issue a contempt finding, relying on the Goswicks' good faith reliance on the new statutes and pointing to confusing advice which the Goswicks received from their attorney, but nonetheless assessed them for Welsch's attorney fees ($4,000) based on the fact the injunction was violated. It also issued a cease-and-desist order requiring the Goswicks to evict the six elderly ladies within ninety days.

### This Matter Is Properly Reviewed by Direct Appeal

The Goswicks' declaratory relief action, challenging the propriety of the underlying injunction due to changed circumstances, in substance is a motion to dissolve or modify the injunction for changed circumstances. The Welsch contempt action sought enforcement of the injunction. Although the trial court, perhaps improperly, sustained the demurrer to the former action, it in essence consolidated it within the latter action by its judicial notice of the former and its express determination the new legislation had no effect upon the injunction. Consequently, the decision to enforce the injunction by issuing the cease and desist order is predicated upon an implied denial of the motion to dissolve, and is expressly appealable under Code of Civil Procedure section 904.1, subdivision (f). Accordingly, we discharge the writ as unnecessary and treat the matter as a direct appeal.

### The Trial Court Abused Its Discretion in Failing to Modify the Injunction to Allow the Goswicks' Use of Their Property as a Residential Care Facility Serving Six or Fewer Residents

It is settled that where there has been a change in the controlling facts upon which a permanent injunction was granted, or the law has been changed, modified or extended, or where the ends of justice would be served by modification or dissolution, the court has the inherent power to vacate or modify an injunction where the circumstances and situation of the parties have so changed as to render such action just and equitable. (*Sontag Chain Stores Co.* v. *Superior Court* (1941) 18 Cal.2d 92, 94-95 [113 P.2d 689]; *Union Interchange, Inc.* v. *Savage* (1959) 52 Cal.2d 601, 604 [342 P.2d 249]; *Palo Alto-Menlo Park Yellow Cab Co.* v. *Santa Clara County Transit Dist.* (1976) 65 Cal.App. 3d 121, 130 [135 Cal.Rptr. 192]; *Brunzell Constr. Co.* v. *Harrah's Club* (1966) 253 Cal.App.2d 764, 772 [49 Cal.Rptr. 667].) This principle governs even though the judgment providing the injunctive relief is

predicated upon stipulation of the parties. (*Palo Alto-Menlo Park Yellow Cab Co.* v. *Santa Clara County Transit Dist., supra*, 65 Cal.App. 3d 121, 130.) ■ The trial court's decision to either continue, modify or dissolve a permanent injunction will not be set aside on appeal absent the establishment of an abuse of discretion. However, sound judicial discretion calls for modification of a stipulated injunctive decree when circumstances of law existing at the time of issuance have changed, making the original decree inequitable. (*System Federation* v. *Wright* (1961) 364 U.S. 642, 647 [5 L.Ed.2d 349, 353, 81 S.Ct. 348].)

■ The covenant which the injunction purports to enforce, limiting the use of the property to single family residential purposes, is one of several restrictions defined as "mutual equitable servitudes" included within the *Quiet Hills declaration of restrictions*. These servitudes were to be mutually imposed upon a tract of realty consisting of 24 lots "for the benefit of each and every lot and the owner or owners thereof, and with the right of enforcement of said conditions, and each of them, vested in the owner or owners of any one or more of said lots." Such a set of restrictive covenants imposed against owners in a subdivision attempts to *mutually* restrict the actions of all owners for their *mutual* benefit. (See *Sain* v. *Silvestre* (1978) 78 Cal.App.3d 461, 465-466 [144 Cal.Rptr. 478], disapproved on other grounds in *Reynolds Metals Co.* v. *Alperson* (1979) 25 Cal.3d 124, 129 [158 Cal.Rptr. 1, 599 P.2d 83]; *Werner* v. *Graham* (1919) 181 Cal. 174, 183 [183 P. 945].) As mutual equitable servitudes, they individually become unenforceable absent mutuality of obligation. In other words, the *declaration of restrictions* operates much like a minizoning ordinance and accomplishes little if it does not apply equally to all lots in the subdivision. (See generally Comment, *Validity Rules Concerning Public Zoning and Private Covenants: A Comparison and Critique* (1966) 39 So.Cal.L.Rev. 409.) Thus, if we conclude a restrictive covenant, reasonably interpreted, does not now prohibit a given use of property by all other lot owners in the subdivision, it would be inequitable to continue to enforce that same prohibition against one lot owner merely because he is subject to a continuing injunction originally issued at a time when the covenant may reasonably have been interpreted to prohibit the use. Indeed, the courts exercise a general control over restrictions on use of land, and should refuse equitable enforcement by injunctive relief where the restriction is unreasonable or where enforcement is no longer equitable. (3 Witkin, Summary of Cal. Law (8th ed. 1973) Real Property, § 402, p. 2094.) Underlying this principle is the simple realization that time, circumstances and public policy may change the reasonable interpretation of a

restrictive covenant. Accordingly, for the purposes of the instant case, we must determine whether social, economic and legal conditions have changed such that the covenant, limiting use of subdivision lots to single-family residential purposes, would currently be interpreted to prohibit operation of a residential care facility serving six or fewer persons.

We commence our task, cognizant of the established rule that "[r]estrictive covenants will be construed strictly against persons seeking to enforce them, and in favor of the unencumbered use of the property." (*Biagini* v. *Hyde* (1970) 3 Cal.App.3d 877, 880 [83 Cal.Rptr. 875]; *Ezer* v. *Fuchsloch* (1979) 99 Cal.App.3d 849, 861 [160 Cal.Rptr. 486]; *Sain* v. *Silvestre, supra*, 78 Cal.App.3d 461, 474; *Terry* v. *James* (1977) 72 Cal.App.3d 438, 443 [140 Cal.Rptr. 201]; *Lincoln Sav. & Loan Assn.* v. *Riviera Estates Assn.* (1970) 7 Cal.App.3d 449, 463 [87 Cal.Rptr. 150].)

In 1978, the Legislature enacted article 7 of the Community Care Facilities Act (§ 1566 et seq.) which is entitled "Local Regulation." The bulk of the article regulates local zoning ordinance interference with residential facilities[5] serving six or fewer persons.[6] (See in particular § 1566.3.) Section 1566 declares the public policy of this state "that each county and city shall permit and encourage the development of sufficient numbers and types of residential care facilities as are commensurate with local need." However, section 1566.5 makes an explicit attempt to reach nongovernmental action: "For the purposes of any contract, deed, or covenant for the transfer of real property executed on or after January 1, 1979, a residential facility which serves six or fewer persons shall be considered a residential use of property and a use of property by a single family, notwithstanding any disclaimers to the contrary."

The net effect of article 7's enactment is that operation of a residential care facility serving six or fewer persons constitutes a single family residential use for the purposes of *all* governmental action and for the purposes of private covenants entered into after January 1, 1979. We

---

[5]Section 1502, subdivision (a)(1), defines "residential facility" as "any family home, group care facility, or similar facility determined by the director, for 24-hour, nonmedical care of persons in need of personal services, supervision, or assistance essential for sustaining the activities of daily living or for the protection of the individual."

[6]Section 1566 states that "'six or fewer persons' does not include the licensee or members of the licensee's family or persons employed as facility staff."

recognize that the statutes do not attempt to reach covenants entered into before 1979. Nevertheless, article 7 constitutes a strong statement of public policy in favor of a broad interpretation of single family residential use in this area. (See *Carr* v. *Kingsbury* (1931) 111 Cal.App. 165, 168 [295 P. 586].)

Several recent cases from other jurisdictions[7] dealing with similar fact situations support a conclusion the operation of a residential care facility is no longer inconsistent with single-family residential purposes. Of particular interest is the recent decision of the Montana Supreme Court in *State, etc.* v. *District Court, etc.,* (1980) — Mont. — [609 P.2d 245], which involved circumstances substantially similar to this case. The Montana Legislature passed legislation designed to encourage community care facilities for developmentally disabled individuals.[8] As part of the legislative package, a statute prohibited local governments from zoning to exclude community care facilities from single-family residential neighborhoods. (Cf. § 1566.3.) Although the legislation did not purport to affect private restrictive covenants, the Montana Supreme Court considered the statutes to be persuasive authority supporting an interpretation of "single-family residential" covenant as not excluding community care facilities. (*State, etc.* v. *District Court, etc., supra,* 609 P.2d 245, 247-248.) By comparison, here the California Legislature went one step further by directly regulating private covenants entered into after the passage of article 7. Surely this additional act aimed at furthering the purposes of the Community Care Facilities Act should not be viewed by the courts as a limitation upon the public policy articulated.

The result reached by the Montana Supreme Court is in accord with numerous recent decisions of courts in varying jurisdictions concluding the operation of small residential care facilities for persons with various

---

[7]We are aware of only one California case which has touched on this issue. In the 1972 case of *Seaton* v. *Clifford* (1974) 24 Cal.App.3d 46 [100 Cal.Rptr. 779], the court concluded a single-family residential purpose covenant was violated by the operation of a care facility for six mentally retarded adults. Since the issue we address here is one of changed circumstances in a rapidly developing area of social concern subject to continuing legislative scrutiny, a 10-year-old case is of limited persuasive value. Additionally, the court's opinion in *Seaton* does not make clear the extent to which the factual peculiarities of that care facility were inconsistent with a single-family residential environment. In this case, there is no evidence the use is not consistent with the attributes normally associated with a family residential environment.

[8]The relevant statute defined such a facility as one serving not more than eight developmentally disabled persons. (*State, etc.* v. *District Court, etc., supra,* 609 P.2d 245, 247.)

disabilities is not inconsistent with single-family residential use restrictions. (See, e.g., *J. T. Hobby & Son, Inc.* v. *Family Homes, etc.* (1981) 302 N.C. 64 [274 S.E.2d 174]; *Costley* v. *Caromin House, Inc.* (Minn. 1981) 313 N.W.2d 21; *Crowley* v. *Knapp* (1980) 94 Wis.2d 421 [288 N.W.2d 815]; *Malcolm* v. *Shamie* (1980) 95 Mich.App. 132 [290 N.W.2d 101]; *Bellarmine Hills Ass'n* v. *Residential Systems Co.* (1978) 84 Mich.App. 554 [269 N.W.2d 673].) These decisions fortify a conclusion that the *Quiet Hills declaration of restrictions* should no longer be interpreted to preclude the Goswicks' operation of a limited residential care facility.

Finally, recent changes in the social fabric convince us that operation of a residential care facility for six or fewer residents is not inconsistent with a single-family residential purpose restriction. Today, the family unit is rapidly losing its cohesiveness; urbanization, technological progress and social change have all contributed to its decline, causing law enforcement, educational institutions and social services to attempt, with mixed results, to fill the void. Nowhere has this effect been more pronounced than in the case of those members of our society unable to totally care for themselves. Where in times past the family unit provided support and care for the handicapped, the retarded, and most especially the elderly, family disintegration has left many of these individuals with few alternatives. (See generally, Nelson, *The Burdens of Old Age on the Family*, L.A. Times (Jan. 19, 1979).)

Recognizing that institutional care can seldom provide the kind of individualized support which can make the difference between productive self-actualization and unproductive stagnation, the Legislature has advocated the development of small community care facilities as a preferable alternative to hospitals, rest homes, and the like. (See § 1501.) These residences provide an alternative family structure offering the aid, encouragement and companionship necessary to help disabled persons realize their full potential. Given that purpose, we believe such facilities coincide with the traditional objectives and values associated with single-family residential neighborhoods.

In light of the foregoing, we conclude the covenant may no longer be read to prohibit the operation of a residential care facility serving six or fewer persons. Because the Goswicks may no longer equitably be enjoined from engaging in activities which every other lot owner in the Quiet Hills Subdivision is free to pursue, the trial court abused its discretion in continuing to interpret the injunction as precluding this

limited use and, thus, in failing to modify the injunction to permit the operation of a residential care facility serving six or fewer persons. Accordingly, we reverse the order and modify the injunction consistent with the language of the covenant so as to merely prohibit the use of the property in any manner inconsistent with a single-family residential purpose.

*Disposition:*

The order awarding attorney fees and directing the cease and desist order is reversed. The trial court is instructed to modify the underlying injunction so as to prohibit only those uses of the property not consistent with a single-family residential purpose.

Wiener, J., concurred.

**STANIFORTH, Acting P. J.**—I concur in the result reached by the majority. However, in my opinion a broader and more compatible legal premise to support the result here is that the stipulated judgment was invalid when it was made, because judicial enforcement of that judgment violates the Goswicks' rights under the California Constitution. (Art. I, § 1.)

I

Goswicks argued that the statutes collectively known as the Community Care Facilities Act (Act) (Health & Saf. Code, § 1500 et seq.) make the stipulated judgment unenforceable. However, section 1566.5 of the Act makes the law expressly prospective to private covenants executed "on or after January 1, 1979." These 1978 statutes therefore do not void the covenant or the stipulated judgment here. I would search further for reasons why the stipulation is not enforceable. To this end, the Goswicks rely on the rationale of the landmark decision in *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123 [164 Cal.Rptr. 539, 610 P.2d 436, 12 A.L.R.4th 219]. That decision invalidated the city's "rule of 5" in its R-1 ordinance, as an unconstitutional invasion of the residents' privacy in choosing living companions, violative of California Constitution, article I, section 1 (added 1974). *Adamson* augured a new approach to municipal zoning, which now may not irrationally or arbitrarily infringe constitutional privacy rights without a showing of compelling justification. (See *City of Chula Vista* v. *Pagard* (1981) 115 Cal.App.3d 785 [171 Cal.Rptr. 738].) *Adamson* holds the least favored

zoning restrictions are those aimed at broad categories of uses, barring the harmless with the objectionable. The Goswicks argue the same constitutional based rules apply here; their use of the property is entirely innocuous, does not in any way effect or subvert the residential character of the neighborhood or otherwise infringe upon any of the legitimate goals of single family residential use restrictions.

However, the *Adamson* decision articulates limits on *governmental entities* in enacting land use laws; it sets no express limit on private restrictive covenants such as in the case at bench.

## II

Private covenants which directly foster an unconstitutional and invidious form of discrimination, most commonly racial discrimination, have been denied judicial enforcement. (*Shelley* v. *Kraemer* (1948) 334 U.S. 1 [92 L.Ed. 1161, 68 S.Ct. 836, 3 A.L.R.2d 441]; *Abstract Investment Co.* v. *Hutchinson* (1962) 204 Cal.App.2d 242 [22 Cal.Rptr. 309]; cf. *Mulkey* v. *Reitman* (1966) 64 Cal.2d 529 [50 Cal.Rptr. 881, 413 P.2d 825].) The same rule applies to covenants which violate state laws, such as the Unruh Civil Rights Act (Civ. Code, §§ 51, 52) or Rumford Fair Housing Act (Gov. Code, § 12900 et seq.). In California, however, the extent to which the *Shelley* v. *Kraemer* doctrine shall be applied to private restrictive covenants is unclear.

In the *Abstract Investment Co.* case, *supra*, the Court of Appeal held a tenant defending an unlawful detainer action was entitled to raise the affirmative defense of racially motivated eviction, because under the *Shelley* v. *Kraemer* doctrine, the court would not lend its equitable powers to assist an unconstitutional discrimination. Yet in *Hill* v. *Miller* (1966) 64 Cal.2d 757 [51 Cal.Rptr. 689, 415 P.2d 33], when a tenant brought an action seeking an injunction to restrain defendant landlord from evicting the tenant solely because of his race, the Supreme Court affirmed the judgment for the landlord, saying private acts of discrimination are not unlawful and the Fourteenth Amendment imposes no affirmative duty on the state to take positive action to prohibit a private discrimination. *Hill* did not overrule *Abstract Investment*; to the contrary, it cited it expressly with approval for the proposition the state may not make available to a discriminating landlord the aid and processes of courts. *Hill* has later been cited by various authorities for the proposition private discrimination is not unlawful unless a statute prevents it. (See, e.g., 2 Miller & Starr, Current Law of

Cal. Real Estate (rev. ed. 1977), § 15:31.) Clearly, though, that interpretation is too broad, given *Hill's* express approval of the *Abstract Investment* doctrine. Rather, *Hill* and *Abstract Investment* can be reconciled based upon their different procedural posture. Private discrimination is unenforceable in an affirmative action, as for eviction, by the landlord (or analogous person), but a potential discriminatee may not come into court in advance of the discriminatory eviction to enjoin it. From this rationale it follows, in terms of the procedural history of this case, the Goswicks would not be entitled to the declaratory relief to prevent enforcement of the covenant, but if the covenant infringed a constitutional rule, they could resist eviction and defend a contempt action on that ground.[1]

Here, without question, the covenant violates the constitutional privacy right defined in the *Adamson* case, *supra*, because it, exactly like the *Santa Barbara* "rule of 5," seeks to control a personal living arrangement which (1) in no way adversely impacts the neighborhood nor threatens the goals of the restrictive covenants or the local zoning, and (2) this conclusion is evidenced by the 1978 legislation, declaring it to be a use which in no way differs from single family residential use generally.

The nonretroactivity of the statute is immaterial when used in this context. Although legislation may not reach backwards in time to impair private obligations of contract, fundamental constitutional rights may not be transgressed whether by pre-existing or contemporaneous agreement. The *Adamson* decision rested upon a constitutional basis, and the values it describes and protects are those infringed by the covenant here. The 1978 legislation is relevant only to confirm the nonoffensive nature of the Goswicks' use. The Goswicks' right to maintain that use has been protected since 1974 by the constitutional announced privacy right to choose their living companions and pursue their chosen lifestyle without interference, so long as that use does not

---

[1] We do not here confront the niceties involved in those cases that distinguish affirmative v. nonaffirmative action of a court. We need not seek out the "significant" "immediate" "direct" degree of state involvement or action. (See *Reitman* v. *Mulkey* (1967) 387 U.S. 369 [18 L.Ed.2d 830, 87 S.Ct. 1627]; *Mulkey* v. *Reitman, supra*, 64 Cal.2d 529, 536 [50 Cal.Rptr. 881, 413 P.2d 825]; *Kruger* v. *Wells Fargo Bank* (1974) 11 Cal.3d 352 [113 Cal.Rptr. 449, 521 P.2d 441, 65 A.L.R.3d 1266]; *Garfinkle* v. *Superior Court* (1978) 21 Cal.3d 268 [146 Cal.Rptr. 208, 578 P.2d 925].) There is, beyond doubt, significant, immediate, and direct state (court) action involvement in the ordered eviction of six elderly ladies and assessing of $4,000 attorney's fee against the Goswicks.

adversely affect the single family residential character of their neighborhood. I conclude the trial court's enforcement of the covenant and preventing the Goswicks' present use is unconstitutional under *Adamson, supra*, 27 Cal.3d 123, because it lends the affirmative aid of the courts, through an eviction order, to furthering an unconstitutional invasion of the Goswicks' privacy.

## III

This further fact must be confronted. The Goswicks have previously stipulated to the invalidity of their present use. In general, stipulated judgments fail if they enforce illegal agreements. (See generally, 1 Witkin, Cal. Procedure (2d ed. 1970) Attorneys, § 123; cf. *Oakland Raiders* v. *City of Berkeley* (1976) 65 Cal.App.3d 623 [137 Cal.Rptr. 648].) While such judgments have many of the attributes of private contracts (e.g., *Jackson* v. *Puget Sound Lumber Co.* (1898) 123 Cal. 97, 100 [55 P. 788]), yet because the court is a party to such a judgment it necessarily retains some discretion to avoid such an agreement beyond its normal powers to interfere with a purely private contract. (See, regarding the strict construction of stipulations, *City of Ukiah* v. *Fones* (1966) 64 Cal.2d 104, 107 [48 Cal.Rptr. 865, 410 P.2d 369].) The statute (Health & Saf. Code, § 1566.5, *infra*) which expressly preserves the validity of pre-existing *deeds, contracts*, and *covenants* (discriminating against residential care facilities) yet does not expressly exempt pre-existing *stipulations* or *consent judgments*. Orthodox doctrine holds a stipulation is void only if contrary to public policy in effect when it was signed (e.g., *Cooley* v. *County of Calaveras* (1898) 121 Cal. 482, 485-486 [53 P. 1075]; *Russell* v. *Soldinger* (1976) 59 Cal. App.3d 633 [131 Cal.Rptr. 145]). Nevertheless a stipulation should not be judicially approved and enforced when it violates an express constitutional right as well as being contrary to a presently operative legislative policy. (*Oakland Raiders* v. *City of Berkeley, supra*, 65 Cal.App.3d 623.)

It is argued we are not dealing with an absolute constitutional right when considering the right of privacy and therefore different considerations should apply to privacy restricting conditions than in racially restrictive covenants which are always impermissible.

Two arguments have suggested as compelling enforcement of this stipulated judgment. First, the right of privacy differs from the right of equal protection in its less than absolute character. The right to privacy

can be sold, waived or given up. There is no antisocial or immoral connotation that necessarily attaches to such an act. Also different considerations surround enforcement of racially restrictive covenants, of which perhaps the most important is, it is not normally the victim of racial discrimination—the minority person—who has agreed to give up his right of equal protection. He is not a party to any covenant at all. He is the recipient of an abomination imposed by others. Here, however, we have a private agreement not to use property in an otherwise lawful way. If the only constitutional protection relevant to this agreement is the right to privacy, and if privacy may be waived, where do we find justification not to enforce the agreement?

As a general basic principal, lawful private agreements are protected, their enforceability normally presumed. Yet the protection of contractual expectation is not sacrosanct; exceptions exist. For example, there is the impossibility doctrine. Agreements are not enforced when to do so would be wholly inequitable or even ridiculous because of some supervening impossibility which could not have been reasonably foreseen or avoided and which was obviously not contemplated by the agreeing parties. There are also the immaterial breach exceptions which preclude one party from standing on the letter of the agreement when the other party's dereliction is trivial, not germane to the agreement's purposes. We must here compare competing constitutonal rights—privacy, with that of contractual expectations. Therefore, we must consider the question of the reasonable fulfillment of sensible expectations within the terms of this agreement.

If the agreement is not enforced the Goswicks get away with having signed a contract and reaped the fruit—avoidance of a lawsuit—without being forced to honor their agreement. Such result has an erosive effect on the general law of protection of expectation of contract fulfillment. It weakens the justifiable reliance of contracting parties on the court's willingness to enforce such agreements. It may therefore indirectly encourage bad faith execution of agreements which the signers do not intend to perform. A juristic as well as moral ill effect follows upon the nonenforcing of the stipulation.

On the other side of the reasonable expectations ledger, the failure to enforce does not violate Welsch's primary objective goal in the litigation, that is to preserve the single family residential use. Regardless of stipulation *in fact the Goswicks' use does not conflict with the single family residential character of the neighborhood.* The failure to enforce

the stipulation may infringe upon some as yet unstated subjective objectives of Welsch. However, such goals cannot be weighed in the balance for Welsch has not opened them to our inspection. On this record we can only conclude she loses nothing of an objective nature by the nonenforcement.

On the other hand, nonenforcement protects the stability of the tenants' domicile and lifestyle. Enforcement conversely would invade and be destructive of such cherished and protected relationships. To sum up the balance, then, it appears if we enforce the stipulation, we would accomplish only one goal—a *theoretical* protection of contractual expectation coupled with punishment of the Goswicks for violating that norm—at the price of disrupting a peaceful and nonoffensive tenancy. But there are other balancing considerations.

## IV

The privacy right in question is not simply the individual's choice to be alone, or to live in a way that does not disturb the neighbors. The attributes of the Goswicks' right to privacy must be viewed in a much broader, society oriented land use context. Such a privacy right affects more people than at first meets the eye. The "privacy" concept expounded in the *Adamson* decision is a protection irrevocably interwoven with the 20th century land use dilemma. Adamson recognized the particular importance of the right to privacy in that context. For the first time our Supreme Court has given explicit constitutional protection, even against governmental regulation, to a nonconforming but objectively harmless lifestyle. It did so in a context of steadily shrinking available housing options and a recessive economy.

I do not assume the Supreme Court intended that protection not to affect private covenants. For restrictions, private as well as governmental, have the potential through stifling, conforming and unjustifiable pressures to disrupt, needlessly, innocent free uses of the land. It is that disruption at which the *Adamson* decision is aimed, and it must weigh strongly in the balance here. The Goswicks' use of the house is analogous to that in *Adamson.*[2] It is limited to a multiple occupancy situation with no discernible objective impact on the neighborhood. In

---

[2]There is no evidence here of any "*transient or institutional uses* (hotels, motels, boarding houses, clubs, etc.)" (*City of Santa Barbara* v. *Adamson, supra*, 27 Cal.3d at p. 133) that would in any way be destructive of the residential character of the neighborhood.

view of the manifest need of every man or woman—child, adult, aged—for shelter, the increased unavailability of shelter, and the societal mandate to prevent chaotic dislocation, the doctrine of the sacrosanct untouchable contract right must give way to limited regulation conformable to the constitutional imperatives. Courts, of course, do not legislate, but they can and do decide the validity of evictions for antisocial reasons, or here, the issue of enforceability of private agreements which disrupt private living arrangements for no valid objective purpose.

The policy we protect is not merely privacy—It is continuity of residence, the right to shelter, the right to stay under one's same roof. Protecting that special kind of privacy right, as accomplished in *Adamson*, is of current critical priority, and will probably become more so as time passes and land resources shrink further. That policy is entitled to more protection than private expectations based on unreasonable motives. The inroad, if such it be, on the juristic doctrine protecting contractual expectancy, must be accepted, as it already has been in other areas of law, as one of the costs of attending on an overcrowded urbanized California.

Freedom of contract is a most important right. Yet in the context of the constitutionally protected, legislatively approved land use involved, the contract right must be subordinated. The goals to be achieved by enforcing this stipulation are not as important as protecting the existing, lawful, conforming tenancies. As of this day a government could not compel discontinuance of the use (*Adamson*) and private parties could not agree to such a covenant after the effective date of the 1978 statutes. The use is wholly harmless, completely compatible with the reasonable expectations of the other subdivision neighbors. Under all these circumstances, to enforce the stipulation would be manifestly wrong.

A petition for a rehearing was denied April 30, 1982, and the petition of respondent and real party in interest Welsch for a hearing by the Supreme Court was denied June 16, 1982.